RAILROAD AND TELEPHONE COS. v. BOARD OF EQUALIZERS OF TENNESSEE.

(Circuit Court, M. D. Tennessee. December 23, 1897.)

1. TAXATION—CONSTITUTIONAL REQUIREMENT OF UNIFORMITY—EQUALIZATION.
Where, under the system of taxation adopted by a state, assessments are made by different officers or boards, the state is equally represented by each, and the legal effect is the same as though it acted through a single board. In such case a constitutional requirement of uniformity in taxation between different species of property of the same value imposes on the state the duty of providing for the equalization of the assessments made by the different boards, to the end that the same measure of value shall be applied to all property.

2. SAME—JURISDICTION OF EQUITY—ACTION OF STATE BOARD.
Const. Tenn. art. 2, § 28, requiring the uniform taxation of different species of property of the same value, is mandatory and self-executing, applying equally to the assessment of property and the levy of taxes thereon; and a determination by the state board of equalizers that under the statute it is not its duty to equalize certain assessments of different species of property made by different officers or boards does not render such assessments legal, nor deprive a court of equity of jurisdiction to inquire into their legality, and enjoin the collection of taxes levied thereon, if not uniform.

3. EVIDENCE—ASSESSMENT—JUDICIAL NOTICE OF RATE.
A court may take judicial notice of an established custom of the assessors of a state to assess property for taxation at less than its actual value.

4. TAXATION—BASIS OF ASSESSMENT.
Neither the par value nor the stock-market quotations of the stock and bonds of a railroad or telephone company furnish a proper basis for the assessment of its property; nor do its gross earnings, leaving out of consideration the operating expenses.

5. SAME—UNIFORMITY.
The assessment of property at its actual value, though nominally authorized or required by the statutes, is excessive and void, as in violation of the constitutional provision requiring uniformity in taxation, when all other property in the state is assessed upon a lower basis.

6. SAME—CONSTITUTIONAL REQUIREMENTS—CONSTRUCTION.
A constitutional provision that "all property shall be taxed according to its value" does not require that it shall be assessed at full value.

7. SAME—INJUNCTION TO RESTRAIN ENFORCEMENT OF TAX.
It was shown that the assessment by the state of railroad and telephone property was at its full value, instead of a percentage only of such value, in accordance with the usage prevailing and recognized in the assessment of other property. It was also shown that the assessed value of railroad property was thereby increased over the previous year, on an average, 74 per cent., and telephone property 500 per cent., while the value of the property of the state, as a whole, had decreased. Held, that such showing made a prima facie case which entitled the owners of railroad and telephone property to an injunction against the enforcement of the tax based on such assessment.

**8.** JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

An assessment of property which violates the provision of a state constitution requiring uniformity in taxation, and which is a class discrimination, also deprives the owner of the equal protection of the law guarantied by the fourteenth amendment to the federal constitution, although the statute under which the assessment was made may have been constitutional, and the illegality is in its administration.

**9.** EQUITY—RELIEF AGAINST ILLEGAL TAX—INJUNCTION.

Equity has jurisdiction to grant relief against unequal taxation by enjoining the enforcement of a tax based on an illegal assessment.

**10.** SAME—TEMPORARY INJUNCTION.

In a suit by railroad companies to determine the validity of a state assessment claimed to be illegal because unconstitutional, the court will grant a temporary injunction on a showing making a prima facie case, restraining the collection of so much of the tax as is claimed to be illegal pending the suit, where, if paid, it would be distributed among numerous counties and municipal corporations, requiring separate actions for its recovery, if found to have been illegally exacted.

**11.** TAXATION—DISCRIMINATION.

This decision throughout proceeds upon the ground that the tax laws of the state, as actually executed, result in a discrimination against a large species of property and a large class of taxpayers, and the case is to be so understood in all its aspects.

These are bills filed by various railroad and telephone companies against the board of equalizers of Tennessee, to restrain said board from certifying the assessed valuation of their properties for taxation for the biennial period including the years 1897 and 1898, alleging that said assessments are invalid for various reasons specifically mentioned. The board of equalizers certify the assessments to the state comptroller, and the comptroller then certifies the apportioned assessment to the various municipal corporations and counties in the state entitled to collect taxes in proportion to the mileage of railway lying within such counties, cities, and towns. The object of the bills is to arrest the certification in both methods by preventing the initial step by the board of equalizers.

Edward Colston, Shields & Mountcastle, Richmond, Chambers & Head, William A. Henderson, Dickinson & Waller, and Vertrees & Vertrees, for complainants.

W. L. Granbery, J. C. Bradford, and G. W. Pickle, Atty. Gen., for defendant.

CLARK, District Judge. The bills in these cases raise fundamental questions of far-reaching importance. The cases have had, in the discussion at the bar, and in the briefs filed, the study and attention which their importance demands. The cases must now be disposed of in the light of what some of the best legal talent in the state can say on both sides of the question. In the industry which has been bestowed upon the cases, a great accumulation of authorities has been furnished in support, as is assumed, of each side of the controversy. The number of the cases cited is so great that counsel readily understand I cannot, in the limits which must be put to an opinion, and, most of all, an opinion upon this application, undertake to review these cases, nor to point out wherein I think particular cases are applicable or inapplicable. At the same time, I have carefully read the

cases cited, except some cases referred to in the brief for plaintiffs to which I have not had access. As I cannot discuss at length the cases referred to as bearing on the different points, I think it may be just as well to state, in a very general way, my impressions after studying the cases, and to cite but few authorities. The cases are of a kind which will, and should, go up for review, and this makes it less necessary that I should express my opinion more in detail upon the points at issue.

As is well understood, the bills involve an attack upon the validity of the assessment of railroad and telephone properties for the biennial period including the years 1897 and 1898. The validity of the assessment is called in question mainly upon the grounds: (1) That the assessment is, in, and of itself, excessive, and above the real value of the property. (2) That the assessment is relatively out of proportion to the taxable value at which other species of property in the state are assessed, whereby the property of these companies is made to bear an undue proportion of the burden of the government, in violation of the constitution of the state, and that they are also deprived of the equal protection of the law, under the fourteenth amendment to the constitution of the United States. (3) That the railroad commission act is unconstitutional, and that the commissioners appointed thereunder are not de jure officers of the state, and are not authorized legally to discharge the duties of tax assessors; these duties being attached, as ex officio power, to the office of railroad commissioners. (4) That these properties were legally assessed in the year 1896 for the years 1896 and 1897, by a valid assessment, and that the new assessment made for 1897 is null and void.

Some minor questions are made, relative to the procedure by the board of equalizers, such as the lack of proper notice of taking depositions, the exclusion of competent evidence, and the admission of incompetent evidence. I shall take up and dispose of what may be regarded as the most fundamental objection made to this assessment. I refer to the objection that the properties of these companies have not been equalized in the taxable value fixed with the assessment of all other property in the state, and have been overvalued.

The particular provisions of the constitution of the state which affect the matter now under consideration are found in article 2, § 28, and read as follows:

"All property shall be taxed according to its value, that value to be ascertained in such manner as the legislature shall direct, so that taxes shall be equal and uniform throughout the state. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of the same value."

It is conceded that railroad and telephone properties have been assessed at their full value, and this is not to be regarded as a disputed fact in the cases. The answer filed by the board of equalizers must be taken as admitting that they made no effort whatever to equalize the assessment on this class of property with the assessments made on other classes of property in the state. The answer clearly admits of no other interpretation. The act contains no provision directing the assessors or board of equalizers specifically to enter upon the duty of equalization for the purpose of avoiding a dispro-

portion between the taxable values of different properties, and the assessors and board of equalizers did not regard it as a duty resting on them to make any effort at equalization, the statute not furnishing, specifically, any means of discharging such a function or duty in any satisfactory or successful manner. Beyond what is thus admitted, the plaintiffs have been put strictly upon proof as to every other fact involved in the issues here raised. The answer of the defendants is extremely guarded and cautious throughout, and contains no intimation as to the exact method by which the results complained of were reached. The defendants, in their answer, content themselves with meeting the charges of the bills by saying, in the most general terms, that they have acted legally. This is, of course, the averment of a mere conclusion of law. In the answer, as well as in the argument, the position taken, in general, is that the board of equalization has jurisdiction to proceed, that the board proceeded regularly, and that its action is final and conclusive until and unless set aside by certiorari proceedings in the state court, this proceeding being called a direct one. Stated in another form, the contention for the defendants is that this court cannot inquire into the facts in the absence of allegations of fraud or bad faith on the part of the board of equalization. It is said, further, that, if errors of law occurred, these must be corrected in the certiorari proceedings, and the jurisdiction of this court to interfere by injunction is denied.

It is conceded, and could not be controverted, that the bill contains no specific allegation of fraud on the part of the board of equalization. While I do not regard this as a controlling point at all in the case, it must be stated, to avoid misapprehension, that, although acting with perfect honesty, if the assessors or board of equalizers pursued methods calculated to bring about a substantial inequality in the taxable value of the properties here in question, as compared with other species of property in the state, the innocent intent in such a procedure would be no justification whatever, in law, for a wrong result. Full legal responsibility is recognized for the necessary, legitimate, and natural result of acts, and a systematic course of procedure and an innocent mistake about the matter does not change the effect. For legal purposes, all persons are presumed conclusively to contemplate and intend the necessary and natural result of their acts. Agnew v. U. S., 165 U. S. 36, 17 Sup. Ct. 235. If the board of equalization was under a duty to equalize, a mistaken view that such was not its duty could not change the law, and could not render a result legal which would otherwise be illegal. Was the board of equalization under obligation, constitutional or legal, to equalize the assessment on railroad and telephone property with the assessment on other species of property subject to taxation? It is obvious enough that if the state adopts a system of taxation by which assessments are made through different officers, agencies, or boards, the state is equally represented by every such board or agency, and, so far as substantial results are concerned, the case is just the same as if the state acted through one board only. This is plainly so, and is recognized as being so in Missouri v. Hannibal & St. J. R. Co., 135 Mo. 625, 37 S. W. 532. The provisions of the constitution

referred to, it must be borne in mind, are mandatory and self-executing. Levee Dist. v. Dawson, 97 Tenn. 160, 36 S. W. 1041; Hyatt v. Allen, 54 Cal. 353; and Board v. Patten, 62 Mo. 444. This being so, no legislation was necessary to give effect to these provisions of the constitution. The constitution is the paramount law of the land, and its mandatory directions impose a duty upon the legislature in the exercise of the taxing power, and equally upon every administrative board or agency provided for the execution of the tax system. If there is a discrimination against this species of property, imposing an unconstitutional burden thereon, the result cannot be sustained; and this is equally so whether such a result is due to erroneous action by the board, or to defect in the legislation, in not requiring equalization, and furnishing the means whereby this might be made real and effective. If the legislature had, in terms, undertaken to exempt this board from the duty of equalization, no person of ordinary intelligence would make any question that such act would have been unconstitutional. Again, if this particular revenue act be construed as not requiring equalization of the assessment on property of this character with assessments on other kinds of property separately treated, and could be regarded as constitutional in respect to the equality guaranty, although not making such requirement of equalization, we would clearly have an instance of special, partial, and class legislation of the most obnoxious kind; for, it is well known that the state, in regard to every other considerable class of property, has provided a board of equalization, charged with the duty of equalizing, and no discrimination in that respect could be made between the property now in question, and other taxable property in the state. It is to be remembered that the constitution is a consistent, systematic, outline limitation, and it will generally be found that an effort to evade one provision of that instrument will bring about a direct antagonism with another.

Returning to the point under examination, it is very clear that the board of equalization, in confirming the assessment made, without any effort whatever to equalize the assessment so that the rate of valuation would bear a substantially just proportion to the rate of assessment on other property, disregarded the constitution. Notwithstanding this, to entitle the complainants to relief, and to make out a prima facie case for injunction, it should probably also appear that the assessment has brought about a substantial disproportion between the taxable value placed on this property, and that at which other property in the state is assessed; and here it is to be observed that a constitutional and legal inequality in taxation does not refer to individual hardship, like the difference in the assessments placed on the property of two individuals, nor does it relate to those differences in value which grow out of mere differences in opinion, nor does it relate to those inequalities which arise by reason of an essential difference in the kind and use of property, with a proportionate difficulty in getting at the real value. Inequality, in the legal and constitutional sense, refers to substantial differences relating to large classes of property, and to differences in the system or methods by which such

properties are assessed for taxation. In Railway Co. v. Guenther, 19 Fed. 398, the doctrine upon the subject was stated by Judge Key as follows:

"Mere inequalities in taxation will not vitiate a tax, if they be accidental and unintentional. These must occur under any system of assessment, and especially under that in force in this state, in which every civil district and ward has its own assessor. There will, of necessity, be many instances in which property will be assessed at more than its value; and more, perhaps, in which it will be assessed at less than its value. These errors and discrepancies will not vitiate the tax. They are inevitable. But a different result follows, should a standard of valuation be used for one species of property which is different from that used for another, if the end reached, necessarily, is taxation of one species higher than the other. The constitution of Tennessee established that all property shall be taxed according to its value, that value to be ascertained in such manner as the legislature shall direct, so that taxes shall be equal and uniform throughout the state. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of the same value. Article 2, § 28. With something of iteration, the principle is emphasized that taxation shall be equal and uniform. If unjust discrimination and difference is made, the tax so imposed may be restrained, and its collection prevented. Pelton v. Bank, 101 U. S. 143; Cummings v. Bank, Id. 153; City of Chattanooga v. Nashville, C. & St. L. R. Co., 7 Lea, 563."

This statement of the law is in harmony with all of the cases. So, whenever a system of taxation is adopted in a legislative enactment, or methods of procedure are followed by administrative boards under such enactment, by which a large class of individuals or a large class of property is discriminated against, either in respect of the rate of assessment or the rate of levy, and such a result violates a fundamental principle of the constitution, courts of equity may properly interfere to restrain the operation of such an unconstitutional exercise of power. In Cummings v. Bank, 101 U. S. 157, the rule was thus stated:

"Independently of this statute, however, we are of opinion that when a rule or system of valuation is adopted by those whose duty it is to make the assessment, which is designed to operate unequally, and to violate a fundamental principle of the constitution, and when this rule is applied, not solely to one individual, but to a large class of individuals or corporations, that equity may properly interfere to restrain the operation of this unconstitutional exercise of power. That is precisely the case made by this bill, and, if supported by the testimony, relief ought to be given."

Other cases, both state and federal, are now agreed upon this proposition.

It may be as well to say, in this connection, that it is now established that the constitutional requirement of uniformity in taxation applies to the mode of assessment, as well as the rate of levy, and the constitution may be violated in a lack of just proportion in the value at which property is assessed for taxation, quite as much as in the rate or percentage at which the tax is actually laid on the assessed value. This is the doctrine on which the Guenther and Cummings Cases proceeded, and was brought out in Railroad Tax Cases, 13 Fed. 722; Bank v. Hines, 3 Ohio St. 15; Board of Sup'rs of Bureau Co. v. Chicago, B. & Q. R. Co., 44 Ill. 228; Chicago & N. W. Ry. Co. v. Board of Sup'rs of Boone Co., Id. 240; and People v.

Weaver, 100 U. S. 544. The principle of these cases has been often reaffirmed, and never questioned in any well-considered case. The case of Sanford v. Poe, 37 U. S. App. 395, 398, 16 C. C. A. 305, and 69 Fed. 546, clearly recognizes, by implication, the rule of these cases,—that where there is a departure from provisions of the statute law relating to assessment, or a violation of the fundamental law, a court of equity will or may enjoin the assessment, as being invalid. Being of opinion that there has been a departure from the constitutional mandate in the assessment here made, I do not find it necessary to decide definitely whether a fundamental error of this kind would, in and of itself, render the assessment invalid, and entitle the taxpayer to an injunction against further proceedings to collect under such assessment. I shall take it for granted, without deciding, that it is necessary, as before stated, for the taxpayer to go further, and establish prima facie, at least, that the unconstitutional method complained of has resulted in a substantial want of equality and uniformity in fact to the injury of the plaintiffs; and this leads up to the question whether or not the plaintiffs have, as a matter of fact, shown a strongly probable right to relief, or, as otherwise stated, whether the plaintiffs have made out a prima facie case.

In Flippin v. Knaffle, 2 Tenn. Ch. 238, one of the state's great judges said:

"Upon the preliminary application for an injunction, all that the judge should, as a general rule, require, is a case of probable right, and probable danger to that right without the interposition of the court; and his discretion should then be regulated by the balance of inconvenience or injury to the one party or the other."

This is the recognized rule of the cases, both English and American, state and federal. Blount v. Société, 3 C. C. A. 455, 53 Fed. 101; Southern Ry. Co. v. City of Asheville, 69 Fed. 361; Africa v. City of Knoxville, 70 Fed. 729, 740; New Memphis Gas & Light Co. v. City of Memphis, 72 Fed. 952; Griffith v. Blake, 13 Eng. Ruling Cas. 112, and English and American notes to that case; Indianapolis Gas Co. v. City of Indianapolis, 82 Fed. 245.

The question recurs, then, have plaintiffs made out a prima facie or probable right to injunctive relief? And this opens up the case on its facts. Whether or not, in treating the case in this aspect, it is competent for the court judicially to recognize and know what is very well understood and common knowledge with all intelligent people in the state, becomes a question. It is a matter of familiar and common knowledge with every citizen of the state that ordinary real property is assessed for general taxation at a percentage ranging from 50 to 75 per cent. of actual value. This is a general system. This has been the practice acquiesced in by the legislative and executive departments of the government from an early day in the state's history. With full knowledge of this method of assessment, the legislatures of the state have recognized the custom; and, in the exercise of the taxing power, the varying demands of the state from time to time for revenue have been met by legislation directed, not to a higher rate in assessment, but to a variation in the rate of levy. This is a long, well-

understood, and well-settled usage in this state. In the Guenther Case, before referred to (19 Fed. 399), Judge Key observed:

"But from the other proof in the cause, and from what a court may judicially know of the history of tax assessments in this region of the country, we think that lands in Roane county were taxed at a valuation, on the average, of one-fourth below their real value. It is quite apparent that the property of complainants was assessed at a valuation much above its real value. It does not distinctly appear what rule was adopted in the valuation of lands, but it is clear that it was not intended to assess them at their real value, but below it; nor were they assessed, as a rule, according to their cost. It is equally clear that it was intended to assess railroad property at its full value, and that in doing so there was fixed upon it an exaggerated and unreasonable valuation. This difference was not accidental."

So, too, in Cumnings v. Bank, after saying that the constitution and statutes of nearly all the states contained enactments designed to put assessments at the actual value of all property, the court observed:

"But it is a matter of common observation that in the valuation of real estate this rule is habitually disregarded."

And the supreme court of Illinois, in Board of Sup'rs of Bureau Co. v. Chicago, B. & Q. R. Co., 44 Ill. 238, 239, it seems, proceeded upon the ground that the court might take judicial notice of a custom or rule adopted by assessors in the state. The question involved in that case was very similar to the one here, and what was said by that court is fully applicable to the point now under examination, as well as other issues in this case. The court said:

"The framers of our constitution, and our lawmakers, to their credit be it said, have kept steadily in view the principle of equality and justice, in adopting a system of taxation which commends itself to the favor and approbation of all well-organized minds. It is no argument to urge that the fault is with the assessors, in the case of individuals, and with railroad companies, in making out their schedules for the county clerk. If the assessors violate their duty, are railroad companies to be the sufferers? If they neglect to act fully up to all the requirements of the law, is that any reason why A. should pay 40 per cent. more taxes, in proportion to value, than B.? The rule adopted by the assessors in this state has grown into a custom, and has been tacitly sanctioned by every department of the government for a long course of years, and it is now too late to challenge it. Even so late as the last special session of the legislature, that body, by clear implication, acknowledged the custom, and yielded to its influence, by the provisions of the act to tax the shares in national banks. They therein impliedly declare that such shares are to be taxed the same as other property. A share of bank stock, under that bill, is not required to pay more state or local taxes than a piece of land or a house of equal value; and the plain inference is, if such property be assessed on only one-third of its actual value, bank stock shall be assessed on the same per cent. of its actual value. Would not the sense of justice of every man in this community be outraged by allowing this or any other depreciation to one class of people, and demanding of another a higher tax on a similar article of the same actual value? The proposition cannot commend itself to the favor of any just man, and can receive no countenance in any court of justice. It is an admitted fact on both sides to this controversy that the property of no one owner in the county of Bureau has been taxed on its real value, and that the per cent. added by the board of supervisors to the valuation of the property of appellees imposes on them a greater proportionate burden than the law requires them to bear. We are of this opinion, and therefore consider the action of the board unfounded in justice, and in direct opposition to the constitution. The great and attractive feature of uniformity has been disregarded by the board, and appellees victimized. It may be very desir-

able that the greatest share of the public's burdens shall be borne by these corporations, but, until there be a radical change in our fundamental law, it cannot be done. They stand on the platform of equality before the law, and no greater burden for the support of government can be imposed upon them than can be placed on the individual taxpayer."

Other cases are to the same effect. If, therefore, the court may judicially know an established custom in regard to tax assessment in the state, it would not be controverted for a moment that the court must know that ordinary real property in the state is assessed for taxation at a rate not exceeding 75 per cent. of actual value. In addition to this, the proof in the case, so far as developed, establishes that a lower percentage than this is the prevailing rate of assessment in some of the largest cities and counties in the state. It further appears that the state board of assessors and equalizers, established under the act of 1895, undertook, after considerable labor, and extensive travel over the state, to equalize assessments for 1895 and 1896 on a 75 per cent. basis; thus yielding to the influence of a long-established usage in this state. It is true that the board does not appear to have officially recorded or proclaimed this result, but, as it was acting at the time as the authorized representative of the state in the exercise of the taxing power, it is not perceived how its action is diminished in importance by this fact. The rate at which that board undertook to equalize throughout the state was confessedly considerably above the average rate of assessment prevailing in many localities.

In regard, now, to railroad and telephone properties assessed for the years 1897 and 1898, it is frankly conceded that the assessors have brought this property up to its full, actual value, and that they have done so understandingly, believing that it was their duty to assess it at its full value, in accordance with the provisions of the constitution of the state hereinbefore referred to. In addition to these, certain other very striking circumstances are now to be referred to, as bearing upon the question of overvaluation of these properties, as well as a relative excess under the constitutional provision requiring equality. It appears that the aggregate assessed value of all taxable property has been declining somewhat since 1891. It is a matter of common knowledge and observation that there has been a constant shrinkage in values of all properties during these same years, and in no class of properties more than in railroad properties. The numerous receiverships in the courts of the country over such property furnish one, among many, elements of evidence showing this to be so. The legislature has not undertaken to meet this variation by securing a different rate of assessment, but by changes in the percentage of levy. There has been no raise, confessedly, in the assessed valuation of other classes of taxable property in the state. It appears that railroad and telephone properties in Tennessee, excluding localized property, were assessed for 1896 and 1897, in the aggregate, as follows:

Railroads ................................................$40,979,108
Telephones ................................................ 243,660

The same properties have been reassessed for 1897 and 1898 as follows:

Railroads .............................................$70,000,000
Telephones ...........................................  1,445,515

The percentage of increase is much higher upon some of these properties than others. On certain lines of railway, and certain divisions, the increase is enormous and startling; and, as appears from the foregoing figures, the aggregate increase on railroads is, approximately, 74 per cent., and that on telephones, approximately, 500 per cent. It is certain that, if this result is even approximately correct, all previous assessments and equalizations in the state of Tennessee have been remarkably inefficient, and the conduct of all officials charged with duties under the tax system of the state extremely negligent, to say no more of it. The present assessed valuation will be found similarly out of proportion to the taxable value fixed upon similar property in the adjoining states. This is not seriously controverted. I have before referred to the fact that the defendants have, so far, refused to disclose the methods by which this result was reached. It would seem only fair, after having brought about so striking a result as that referred to, under the circumstances just mentioned, that the defendants should have been willing to furnish at least an outline of the facts and figures which form the basis of estimates or calculations which have resulted in an increase in taxable values so enormous as we here have. The plaintiffs constitute a large class of taxpayers, and are complaining that they have been denied a carefully guarded constitutional right, whereby their property is about to be made to bear an unjust and oppressive proportion of the government burden of taxation. It would seem that at least some reasonable explanation should have been furnished under the circumstances. As I have said, the charges in the bill are met by the statement that the defendants have acted legally, and that their action is conclusive. While the board of equalizers have thus declined to furnish any facts and figures, counsel, in argument, have diligently sought to furnish prima facie justification for a result so far out of proportion to anything in past history in this or adjoining states, and in a time with property of all kinds steadily on the decline in value. This showing was in the way of handling on paper certain figures, based on stock and bond quotations and earning statements, presumably furnished to counsel by the railroad assessors. The statute does not, as has been well said, authorize a stock and bond basis as a standard of value, but only permits the market value of these to be looked to as an element in the evidence. Notwithstanding anything that may have been said in judicial decisions and legislative enactments, no more uncertain or delusive element in the attempt to fix values was ever resorted to than this stock and bond basis, unless handled with extreme caution, and with those qualifications for such a task which come only from special training and experience in such matters. The necessity for such training and experience was distinctly recognized and stated by the supreme court of Minnesota in Steenerson v. Railway Co., 72 N. W. 716. That court said:

"The members of such a commission should be men of great financial ability, who have had a large amount of training and experience to fit them for

their responsible and difficult duties, and they should be thoroughly familiar with the many financial and economic problems which enter into the business of constructing and operating railroads."

This observation was made in regard to placing valuation on this particular kind of property generally; for the court in that case rejected the stock and bond basis for fixing value, and went far towards the adoption of the New York rule. To the person familiar with such matters, it is well known that the stock and bonds do not, as a rule, at any time represent the money actually invested in a property of the character here in question. It is only necessary to note the case of bonds sold below par, and, again, the fraudulent practice of "watered stock," to show the utter unreliability of such an element. Again, the value of a bond in market depends almost entirely on whether or not the interest coupons are promptly paid, and money which ought to go to betterments and improvements is often required for the payment of such interest, and is so applied, while the physical condition and value of the railroad property is rapidly running down from day to day, with not a cent of net earnings. On the other hand, as a result of applying gross income to betterments and improvements on the property, default is made in the payment of interest on bonds or dividends on the stock, and these securities rapidly decline in the market, while the actual value of the property has been rendered constantly greater. So, too, the effect of good or bad management of a railway on the market quotations of stock and bonds is well known. And, still more, the effect of the operations of what in speculative parlance are called the "bulls and bears" of Wall street, is quite well understood. All that can be had are Wall-street quotations, which vary widely from day to day, as the result of the conditions alluded to, and this is practically not different from a speculative process. If there were at any time a real market value for such securities, as bona fide investments, it might be otherwise. But, whatever may have been the conditions in former years, it has come to pass that there is no real market value to these securities, fixed by purchases for permanent holding and for intrinsic value. Wall-street operations and quotations are constantly influencing the figures at which they are held and sold, and such figures are largely speculative. These observations relate, of course, to interstate railroads, or important lines in an interstate system. When dividends are paid on stock, and interest on bonds, these become important, more as showing earning capacity, and in that way the value of the railroad property, as operated and used in connection with the franchise. This earning value will be found to vary greatly at different times, but is always more reliable than Wall-street quotations, or the par value of stock and bonds; no real investment market value being obtainable, and the manipulated figures of the stock exchange being no just criterion whether these be high or low at a given time. Apart from these particular objections to values fixed by stock-exchange quotation, as shown by the Financial Chronicle, or other like sources of information relied on by the board in this case, and speaking of stock as a criterion of value generally, the court, in Cotting v. Stock-Yards Co., 82 Fed. 854, said:

"Again, when property has been capitalized by issuing stock, neither the market value nor the par value of the stock can be accepted in all cases as a proper criterion of value, because the stock may not represent the money actually invested; and, furthermore, because the property may have been capitalized mainly with reference to its income-producing capacity, on the assumption that it is ordinary private property, which the owner may use as he thinks proper, without being subject to legislative control. On the other hand, however, when property is valued for the purpose last stated, it is clear that the owner thereof is entitled to the benefit of any appreciation in value, above the original cost and the cost of improvements, which is due to what may be termed 'natural causes.' If improvements made in the vicinity of the property, the growth of the city or town where it is located, the building of railroads, the development of the surrounding country, and other like causes, give property an increased value, the owner cannot be deprived of such increase by legislative action which prevents him from realizing an income commensurate with the enhanced value of his property. Applying these general principles to the case in hand, the court concludes that neither the sum for which the property of the stock-yards company has been capitalized, to wit, $7,368,650, nor the market value of its stock, can be accepted in this proceeding as a correct test of its value. In the first place, the outstanding stock represents property of the value of upwards of $1,000,000, not used for the purpose of yarding and feeding stock, which must be excluded in computing the value of the company's property which will be affected by the statute in question. In the second place, a large percentage of the stock now outstanding does not represent money actually paid in by the shareholders, or property conveyed to the corporation, but represents, rather, an assumed appreciation in the value of the company's property over first cost, and the good will of its business. On one occasion, the stock of the company was doubled (that is to say, it was increased from $1,000,000 to $2,000,000), without the payment of any money, each stockholder receiving an additional amount of stock equal to the amount which he then held. It is fair to infer that a large amount of stock has been issued by the company, not so much with reference to the actual value of its physical property, as with reference to the income which it could be made to produce, and the dividends it could be made to pay. That this latter consideration has been a potent factor in producing the present volume of stock is a necessary inference from all the testimony."

It is noteworthy, too, that the legislature and the court of appeals of New York state, in the very atmosphere of these Wall-street quotations called "market prices," have, as it would seem, repudiated these quotations as an element calculated to determine true values. The legislation of that state is rapidly coming to a sound and practical basis for the assessment of railroad property. This is done by determining what it would cost to reproduce the property in its present condition, and at its present value, and to this is added the value of the franchise, which may be ascertained by looking to the actual earnings of the property as a basis; for it is this which shows the true value of the franchise and its use in connection with all of the tangible property. The stock and bond basis is liable to be erroneous and misleading in other practical particulars, which I will not stop to point out. When we come to actual earnings, a sensible and safe element is reached, which may be properly regarded in determining actual, as distinguished from purely speculative, values on property. Earnings, however, furnish a safe basis on which to estimate values only when net earnings are considered. Indeed, no just result can ever be had by treating any element in a method of figuring on paper only. It is familiar knowledge that properties of this kind are operated at an enormously great expense, when com-

pared with the operating expenses of other classes of property; and in a given case the gross earnings and receipts might be large, while nothing whatever would be left as a net result to pay a dividend or interest on the property actually invested, after deducting proper charges. It was apparent in the figures handled in argument that this process was to take what was assumed to be net earnings (but in fact, as I think, not net earnings at all), apportion this on a mileage basis on so much of the railroad as lies within the state, and then capitalize at, say, a rate of 10 per cent. from this income. In other words, for illustration, if the income appeared to be $10,000 per mile, it was supposed that this would justify capitalization at the sum of $100,000, and that this capitalized sum could be regarded as the interest-producing principal. This was an effort to apply the familiar problem of having the amount and the rate of interest with which to determine the principal. So, on $10,000 earnings, it would be found that the property for taxation was worth $100,000; and this was the process, although it was apparent that on the capitalized sum, when operating expenses, including expenses of repairs, were deducted, there would be little or no net income whatever. It needs no comment to show the fallacy of a process like this.

Section 5 of chapter 5 of the assessment act, in setting out what may be looked to by the assessors, specifies "gross receipts," and nowhere, apparently, permits the assessors to have regard to net earnings as an evidential fact in arriving at the valuation. It is obvious that the gross-receipts process, as applied to a manufacturer, farmer, or other property holder, of any kind or character, would be destructive, in the burden of taxation imposed. I refer, of course, to gross earnings only. It is now well settled that legislation prescribing tariff rates by railroads, gas charges by gas companies, and water rates by water companies, must be reasonable, as regards both the company and the public, and that whether the legislation is so or not is eminently a question for judicial investigation. Whenever such legislation prevents a fair and reasonable return on the capital bona fide invested in business, such legislation is in conflict with the constitution of the United States, as depriving a citizen of his property without due process of law, and as depriving him of the equal protection of the law. This reasonable return or interest on the capital invested means a reasonable net income or dividend after deducting operating expenses, and repair charges. The rule takes into account capital actually invested, only, and excludes fraudulent or "watered" stock, commonly so called. It is not difficult to see that taxation based directly on gross receipts, as such, could easily be carried to a point that would contravene this constitutional limitation. Railway Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484; Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 458, 10 Sup. Ct. 462, 702; Ames v. Railway Co., 64 Fed. 165; New Memphis Gas & Light Co. v. City of Memphis, 72 Fed. 952; Cotting v. Stock-Yards Co., 79 Fed. 679; Indianapolis Gas Co. v. City of Indianapolis, 82 Fed. 245,—this last case, it is said, has just been affirmed on appeal; Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047. It would seem to follow that if the tax could not be laid directly on gross receipts, so as to prevent a rea-

sonable return on property actually invested, the same result could not be effected by using gross receipts as a basis on which to estimate large values, and, by excessive taxation, prevent a reasonable return in an indirect method. And it is curious to note the apparent tendency in some decisions to hold to the stock and bond basis in fixing values at high figures for the purpose of taxation, while rejecting such a method in arriving at true value for the purpose of regulation of charges in cases where the question is whether a statute regulating charges and tariff rates is reasonable or confiscatory, as permitting or not permitting a reasonable return on capital invested bona fide in the business. Where true value is a constitutional requirement, as in Tennessee, it would seem to follow logically that such value, for the purpose of taxation, must be substantially the same thing as when value is inquired about for the purpose of regulation.

Much stress has been placed in argument upon the language of the constitution providing "that all property shall be taxed according to its value." Defendants say the proper interpretation of these terms requires that property shall be assessed at its full value, and that, unless plaintiffs can show that their own property has been in fact assessed at more than its actual value, it is not open to them to complain that all other property in the state is assessed only at a percentage of its actual value. The contention is that if the assessors have obeyed the constitutional direction, and assessed plaintiffs' property at its full value, it is no just or legal cause of complaint, and no ground for relief, that other assessors have put a taxable value on other property much less than its actual value. There are, however, two sufficient answers to this contention: Conceding, for the purpose of testing the soundness of this proposition, that the constitutional terms "according to its value" mean the same thing as "at its full value," the contention of the state, then, stated with reference to its effect, is this: That it may assess the property of A. at its full value, in obedience to the constitution, and the property of D. at one-half its value, in violation of the constitution, and, when A. complains that the result has been to violate the constitution in respect to the equality provision, the answer is that the objection is not open to A., because he is taxed on no more than the full value of his own property, and that he must pay 50 per cent. more on the same actual value than D. Now, it will certainly be admitted that the simple statement of such a proposition suggests its utter untenableness. If decisions may be found which apparently uphold a result such as this, they promulgate a doctrine which cannot be accepted as good law. But a second and decisive answer to this contention is that the terms of the constitution, "according to its value," have no such import and convey no such meaning as that attributed to them. I have already pointed out that long-established usage in the executive and legislative departments of the state government has placed a different interpretation upon this provision of the constitution. These words, neither in their original nor in any derivative sense attached to them by usage, necessarily convey any such idea as that imputed to them in this new interpretation, that the meaning is, "at its full value."

The purpose of this provision in the constitution was to make actual value the basis on which the tax should be laid, at whatever rate. The state was left to assess at full value, or at a percentage of value; but the assessment could only be on value, as distinguished from any other mode of assessment. The tax could not be fixed, for example, by the acre, by the 100 acres, by frontage, by the selling price, as shown by the vendee's deed, nor, again, according to locality, nor by any other of the numerous methods in vogue from time to time, but only upon actual value as the true basis. And, with a definition such as this, this constitutional provision reads naturally and intelligently along with the other provisions which are equally binding as to equality and uniformity. In the case before referred to (44 Ill. 240), the constitution of Illinois required a taxable value to be fixed in proportion to actual value. The legislation enacted under that constitution specifically required that "each separate parcel of property shall be valued at its true value in money," but further provided that the price for which such real estate might be sold at a forced sale should not be taken as a criterion of such value. Notwithstanding the specific statutory injunction, the assessors had placed property at a percentage of actual value only, below the real cash value; and, with respect to the property of the railroads, the supervisors, sitting as a board to equalize valuations, raised the assessed value 20 per cent. on rolling stock, and 50 per cent. on fixed and stationary personal property, without making a similar increase on any other class of property. The supreme court of Illinois, referring to this, used this language:

"It cannot be that one portion of the taxpayers in a county, owning taxable property, shall be required to pay more taxes in proportion to its value, no matter how that may be ascertained, than another portion in the same county. If the assessors, regardless of the strict injunction of the law, shall place a value upon property far below its real cash value, and such a practice goes on unchallenged, and is recognized by the authorities having special charge of the revenue of the state, that misconduct must also contain within itself the great and cardinal principle of uniformity. No warrant is given, if the law is not strictly observed in the case of individuals, and their property is not assessed at its actual value, that the property of a corporation situate in the same county shall be assessed at greater proportional value than that of individuals, even though the enhanced assessment is not on the actual cash value of the property of such corporation. The same rule which is applied to individuals, justice and the constitution demand, shall be applied to corporations. To demand of appellants that they should schedule their property at its cash value, while individuals may schedule their property at one-third, or less, of such value, would be to demand of the former three times the amount of taxes demanded of the latter. As we said in the Bureau County Case, such a proposition is so monstrous as to be indefensible by fair argument. Such discrimination is condemned, not only by the constitution, but by the indignant, yet no less just, judgment of an honest people. On the facts, however, we express no opinion, as the case will go to another jury."

And referring to an early and long-continued construction of the law, which has ripened into a usage, the court observed:

"And here we might say, more explicitly than was said in that case, that a long, uniform, and unchallenged practice under a law is strong evidence of the real meaning of the law. To the hoary maxim, 'Contemporanea expositio est optima et fortissima in lege,' is accorded full force in all courts, and we have ever rendered it due respect."

So, too, in the well-considered case of Levee Dist. v. Dawson, 97 Tenn. 161, 36 S. W. 1043, Judge Caldwell, speaking for the supreme court of the state, said:

"Under the constitution of 1796, lands were taxed by the hundred acres, but the constitution of 1834, like that of 1870, contained the provision that 'all property shall be taxed according to its value.' This means that every property tax shall be graduated by the value of the property on which it is laid. Jenkins v. Ewin, 8 Heisk. 478; Mayor, etc., of City of Chattanooga v. Nashville, C. & St. L. R. Co., 7 Lea, 561; Railroad Co. v. Morrow, 87 Tenn. 406, 11 S. W. 348."

This interpretation of the constitution, sanctioned by long custom, is the natural, practical, and just construction.

I conclude that the plaintiffs have made out a probable or prima facie right to relief, both on, the ground of constitutionally prohibited inequality in the rate of assessment applied to this property, and also in regard to certain lines or divisions,—a strongly-probable overvaluation of the property, considered in and of itself, regardless of any constitutional ratio or proportion. My opinion is that the plaintiffs, on the facts, are entitled to a judicial investigation, and are entitled to know the actual processes by which their property has been assessed at a value so out of proportion to that of former years. It may be very true that properties of this kind have not been adequately assessed heretofore, and that such properties are not bearing a just proportion of the government burden of taxation. If this be true, it does not justify the application to this class of property of methods that do violence to the constitution and the settled custom in our tax system. The makers of American forms of constitutional government were by recent lesson fully mindful of the teaching of history that the power to tax is the power to destroy, and that oppressive exactions were generally made under the guise of taxation. A recognition of this truth is everywhere manifested in the constitutional limitations with which the taxing power is guarded. The lapse of time, and the absence of unconstitutional and forced tribute, may diminish our appreciation of the wisdom of the constitutional principle; but neither lapse of time, nor the absence of a reminder lesson, will diminish its value or importance as the constitution's peaceful and wisely-provided shield against oppressive discrimination and destructive exaction under color of a tax burden. A disregard of just constitutional restraint sets an evil precedent, which does not pass away with the occasion which gives rise to it, but returns to torment in unexpected forms. An unequal and unjust exaction is no longer a tax, but confiscation. As the supreme court of the state well observed, "Equality is of the very essence of the taxing power itself." Taylor v. Chandler, 9 Heisk. 357. We have here a serious contention that a constitutional guaranty has been denied to these plaintiffs, and, if such is the case, it would seem to be equally a deprivation of a right secured by the fourteenth amendment to the federal constitution. County of San Mateo v. Southern Pac. R. Co., 13 Fed. 722; County of Santa Clara v. Southern Pac. R. Co., 18 Fed. 385; Fraser v. McConway & T. Co., 82 Fed. 257; Indianapolis Gas Co. v. City of Indianapolis, Id. 245; Railroad Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255. Nor does it change the effect to say that the statute

itself is valid, and that the error was one merely in the administration of the law. The injury is just the same. In Reagan v. Trust Co., 154 U. S. 390, 14 Sup. Ct. 1051, the supreme court of the United States said in respect to this point:

"Neither will the constitutionality of the statute, if that be conceded, avail to oust the federal court of jurisdiction. A valid law may be wrongfully administered by officers of the state, and so as to make such administration an illegal burden and exaction upon the individual. A tax law, as it leaves the legislative hands, may not be obnoxious to any challenge; and yet the officers charged with the administration of that valid tax law may so act under it, in the matter of assessment or collection, as to work an illegal trespass upon the property rights of the individual. They may go beyond the powers thereby conferred, and, when they do so, the fact that they are assuming to act under a valid law will not oust the courts of jurisdiction to restrain their excessive and illegal acts."

It must be repeated that the question is one of the denial of a right secured both by the state and federal constitutions, and all that is now said must be read in the light of this statement, and as limited by the proposition to which this question gives rise.

Believing that plaintiffs have presented a case for investigation, and, prima facie, for relief, I am brought to the question of the appropriate tribunal and the remedy. Diverse citizenship and the federal question constitute the grounds of federal, as distinguished from state, jurisdiction; but the chief objection urged is that of equitable jurisdiction, as distinguished from jurisdiction at law. It is said that the remedy is at law, and by a certiorari proceeding, and that a suit is pending in the state court. It is admitted that the pendency of a suit in the state court is no answer to a suit in this court for the same purpose. In regard to the jurisdiction in equity, and the injunctive remedy, it is sufficient to refer to Sanford v. Poe, 37 U. S. App. 378, 16 C. C. A. 305, and 69 Fed. 546, and Ogden City v. Armstrong (just decided by the supreme court of the United States) 18 Sup. Ct. 98. In regard to relief from an unequal tax, as well as equitable jurisdiction to furnish such relief, the following cases will be found instructive: Darling v. Gunn, 50 Ill. 424; Ex parte Ft. Smith & V. B. Bridge Co. (Ark.) 36 S. W. 1060; Chicago, B. & Q. R. Co. v. Board of Com'rs of Atchison Co., 54 Kan. 781, 39 Pac. 1039; Chicago, B. & Q. R. Co. v. Board, etc., of Republic Co., 14 C. C. A. 456, 67 Fed. 411; Andrews v. Kings Co., 1 Wash. St. 46, 23 Pac. 409; Railway Co. v. Guenther, 19 Fed. 395; Investment Co. v. Charlton, 32 Fed. 192; Benn v. Chehalis Co. (Wash.) 39 Pac. 365; Bank v. Hungate, 62 Fed. 548; Chicago & A. R. Co. v. Livingstone Co., 68 Ill. 458; Marsh v. Supervisors, 42 Wis. 502; Philleo v. Hiles, Id. 527; Investment Co. v. Parrish, 24 Fed. 197; Bank v. Lindsay, 45 Fed. 619, 627; Stanley v. Supervisors, 121 U. S. 551, 7 Sup. Ct. 1234; Merrill v. Humphrey, 24 Mich. 170; Lefferts v. Supervisors, 21 Wis. 688; Mason v. Trustees of Lancaster, 4 Bush, 406; Fuller v. Gould, 20 Vt. 643.

It remains to consider what will be the probable balance of convenience or injury to the one side or the other in maintaining matters in statu quo until the adjustment of rights at the hearing. Looking, then, to the situation of the plaintiffs, it is this: If this enormous increase in the assessed value of their property is al-

lowed to be certified before investigation, they will be required to pay the rate of levy on that assessment to the state, and to all the counties and municipalities in the state; and conceding, for the purpose of this case, that the payment under protest statute is a remedy available to the plaintiffs in the event this assessment should turn out to be invalid, the plaintiffs would nevertheless not only be compelled to raise an unexpectedly large amount of revenue to pay the tax on this assessment, but would be left to the necessity of instituting separate suits throughout the state against the various counties and municipalities collecting parts of these taxes. These suits would be prosecuted at great expense and delay, and, in the event of judgments obtained, would or might require further mandamus proceedings to compel a levy and collection. At least, we should not regard this as very improbable, in the light of history. Then, for any taxes paid to the state after a recovery of judgment, its satisfaction could only be had by an appropriation act through the legislature; and the certainty or success of this remedy, in addition to other difficulties, could hardly be regarded as safe or certain. On the other hand, it is within the power of this court, in granting an interim injunction, to do so on the express condition that these companies shall pay an amount of taxes equal to the sum paid on the assessment made for the years 1896 and 1897, with the further express condition that this shall in no event prejudice the right of the state to collect the balance due under the present assessment, if held valid on the final determination of these suits. This will prevent the writ of injunction from operating unjustly against the state, counties, and municipalities, and nothing short of this affords any adequate protection to the plaintiffs. From the order granting an injunction an appeal may be taken to the circuit court of appeals, and the case, when appealed, takes precedence in the appellate court, so that a hearing can be had, and the action of this court promptly reviewed. This can be easily done at the February term of that court, and the case is one which, being of public importance, that court will promptly dispose of. There is also a case involving the same assessment pending in the state court, which can without difficulty be carried to the supreme court of the state, and a prompt decision had in that court, as well as in the court of appeals, during the month of February or sooner, and any possible injurious delay avoided; and, should a decision be had by the supreme court of the state, I would cheerfully accept its views, so far as the state constitutional question is concerned, and I have no doubt that its conclusions could be readily accepted as sound on any other question, such as the question under the fourteenth amendment.

In the view thus taken of the central question in this litigation, I do not find it necessary to consider or decide upon the other questions raised, such as the constitutional validity of the railroad commission act. It is always a delicate duty, in this court, to pass upon the validity of a state enactment, in relation to the state constitution, in advance of any utterance by the court of highest authority in the state, the peculiarly appropriate tribunal for the set-

tlement of such question. It will be open to both sides to urge in the court of appeals every question made as supporting or opposing the present action of the court, regardless of the fact that I have not passed on it at this hearing, for the question in that court will be whether the action of this court is right or wrong for any reason offered in the pleadings and evidence on either side.

I should have said, in another connection, that my opinion is that, so far as the constitutional question is concerned, it is always open to the courts on both law and fact, and it is not competent for the legislature, as against a question of this kind, to declare that the action of an executive board shall be final and conclusive, any more than a statute could be permitted to declare for itself its constitutional validity and finality. Whether the constitution, as the supreme law of the land, has been violated, is a question for the judicial, and not the legislative, department, and an inquiry like this can no more be shut off indirectly than it can directly. If we should suppose the case of the board of equalization making a superficial or perfunctory showing of equalization, no one would venture, as I think, to claim that this would exclude a judicial investigation as to whether, in fact, there was nevertheless an oppressive discrimination in respect of a large class of property. The constitution can only be satisfied by an equalization made in good faith, upon adequate means and data, and after devoting to the subject a reasonable amount of time and attention. The constitution will never tolerate a merely sham observance.

The result is that the provisional injunction is allowed on the express condition that these plaintiffs pay to the proper authorities a sum equal to the taxes due on the assessments for 1896; this sum to be paid as taxes for 1897, and to go as a credit on the present assessment, if sustained on final hearing, and without prejudice to the state's rights. The taxes hereby required to be paid must be paid on or before the first Tuesday in February next, and on notice of the failure to so pay, and application by the defendants, the injunction will be promptly dissolved.

Nothing has been said in argument in respect to any injunction bond. As the law makes whatever is a just tax a fixed lien on the property, prior to all other liens, and a sum equal to the former taxes is required to be paid in at so early a date, I suppose an injunction bond will hardly be insisted upon; but, if so, that question, and the amount of the bond, unless agreed upon, may be presented to the court.

## NOTE 1.

By way of contrasting the assessment called in question by these suits with former assessments in Tennessee and other states, the following tables will be useful:

The average assessments per mile of the railroads in Tennessee for the past 10 years were as follows:

| | |
|---|---|
| 1887 | $14,514 |
| 1888 | 14,514 |
| 1889 | 13,422 |
| 1890 | 13,422 |
| 1891 | 13,853 |

```
1892 .......................................................... 13,853
1893 .......................................................... 13,420
1894 .......................................................... 13,420
1895 .......................................................... 13,284
1896 .......................................................... 13,284
```

The average assessment per mile of the railroads in the 12 states traversed by the lines of the Illinois Central, Southern, Louisville & Nashville, and Cincinnati Southern Railways are as follows:

```
Alabama ....................................................... $11,171
Arkansas ......................................................  8,577
Georgia .......................................................  8,565
Illinois ......................................................  4,958
Kentucky ...................................................... 15,898
Louisiana .....................................................  6,652
Missouri ...................................................... 10,000
North Carolina ................................................  6,848
South Carolina ................................................  8,911
Texas .........................................................  8,010
Virginia ...................................................... 13,939
Tennessee (heretofore) ........................................ 13,284
```

By way of illustrating the increase in the present overassessments heretofore made in regard to certain lines, the following may be mentioned:

Cincinnati Southern (in hands of receiver):
```
    Tennessee, per mile (heretofore)............................ $ 27,500
    Tennessee, per mile (present assessment).................... 45,000
```
Southern, one line:
```
    Tennessee, per mile (heretofore)............................ $ 22,000
    Tennessee, per mile (now)................................... 31,000
```
Illinois Central, Mississippi Division:
```
    Tennessee, per mile (heretofore). .......................... $ 22,000
    Tennessee, per mile (now)................................... 45,000
```
Louisville & Nashville, "main stem":
```
    Tennessee (heretofore) per mile............................. $ 31,000
    Tennessee (now) per mile.................................... 60,000
```
Cumberland Telephone & Telegraph Company:
```
    Tennessee (heretofore) per wire mile........................ $ 40.00
    Tennessee (now) per wire mile............................... 300.00
```

The state comptroller has made public the general assessments of property for 1897, and, as compared with 1896, they appear to be as follows:

```
Property in general, 1896..................................... $312,472,633
Property in general, 1897.....................................  311,075,545
                                                             ─────────────
    Decrease in 1897.......................................... $  1,397,088
```

The assessments of the railroad, telegraph, and telephone companies for the same years, with the increase on them, will appear by the following comparison:

Railroads:
```
    1896 ...................................................... $41,882,010
    1897 ......................................................  73,366,863
```
Telegraphs:
```
    1896 ...................................................... $   519,396
    1897 ......................................................     751,039
```
Telephones:
```
    1896 ...................................................... $   194,660
    1897 ......................................................   1,440,515
```

It thus appears that the general assessments for 1897 decreased about 4 per cent., while the assessments of the railroads were increased about 74 per cent. When the county and municipal taxes are laid on the basis of the new assessment, it appears that railroads will pay about double the amount of taxes which they have heretofore paid in Tennessee. In 1871, the comptroller's report to the legislature showed that lands were assessed at about one-third their value; the

comptroller, in 1875, put the assessed values at about one-half the true values; and it appears that the present comptroller, in 1895, showed that the property of Tennessee, valued at $319,822,197, ought to be valued at $700,000,000.

## NOTE 2.

In Investment Co. v. Parrish, 24 Fed. 202, Judge Deady said: "But it is not necessary that there should be any actual conspiracy or expressed design to disregard the law in this respect, on the part of the assessor, to render an assessment illegal. Whenever the assessor of a district of a county as large as one of these counties uniformly estimates real property at only one-third of the value he places on mortgages, it is impossible to attribute the result to the infirmity of human judgment, and the only conclusion possible in the premises is that it was deliberately and willfully done, in pursuance of a settled purpose or rule on his part; and where the same thing occurs in a number of counties in various parts of the state, it is manifest that the action of the assessors is not only willful and deliberate, but that it is the result of general and well-understood custom to substitute this conventional value of real property for 'the true cash' one which the statute requires. Indeed, the practice is so universal and well known that the court might take judicial notice of it, and safely assume that there is not an acre of land in Oregon that is valued for taxation at more than one-half its 'true cash value,' and that generally it is not valued at more than one-third of such value.   *   *   *"

"Valuations must be the result of honest judgment, and not of mere will." If arbitrary, reckless, and grossly unreasonable assessments are made, relief will be granted. 1 Spell. Ext. Relief, § 654, and cases cited. And see Railroad Co. v. Cole, 75 Ill. 591; Land Co. v. Gowen, 48 Fed. 771, opinion by Deady, J. The courts in these cases consider what facts show such fraud in law as justifies relief.

The cases of Railway v. Guenther, 19 Fed. 395; Telegraph Co. v. Poe, 61 Fed. 449; Sanford v. Poe, 16 C. C. A. 305, 69 Fed. 546; Telegraph Co. v. Norman, 77 Fed. 13; Chicago, B. & Q. R. Co. v. Board of Com'rs of Republic Co., 14 C. C. A. 456, 458, 67 Fed. 411, 413,—were regarded as reaffirming equity jurisdiction by injunction to arrest an invalid assessment of taxes, and as illustrating by specific application the doctrine generally recognized. In the decision by the circuit court of appeals for the Eighth circuit, the decisions of the supreme court of Kansas were followed. The constitution of Kansas provided that "the legislature shall provide for a uniform and equal rate of assessment and taxation." Article 11, § 1. Railroad property had been assessed at its full value by a state board, while the board of county commissioners assessed other property in the county at one-third of its value. The railway company tendered the taxes due if its property had been assessed upon the same basis as other property in the county of Republic. Collection of the remainder of the tax was restrained by injunction.

In Taylor v. Chandler, 9 Heisk. 350, the power to impose taxes under the constitution of Tennessee was much considered by the supreme court of Tennessee. It was held that the legislative department, in the employment of this power, must be restrained by the limitations imposed in the constitution, and that it devolved upon the judiciary to determine whether it had exceeded these limitations, "declaring its action void when it goes beyond its legitimate powers." In City of Chattanooga v. Nashville, C. & St. L. R. Co., 7 Lea, 561, the same court said there must not be one rule for railroad companies and another for private citizens; the constitution did not permit this.

In Levee Dist. v. Dawson, 97 Tenn. 171, 36 S. W. 1046, the supreme court of Tennessee, referring to the state constitutional limitations on the taxing power, used this language: "Taxes laid primarily for the state must be laid on all nonexempt property according to value, so as to make them equal and uniform throughout the state; and taxes laid primarily for county, municipal, or other authorized local purposes must be laid on all nonexempt property according to value, so as to make them equal and uniform throughout the more restricted territory to be especially benefited thereby."

Railroad Co. v. Bate, 12 Lea. 574, is a well-considered case. Judge Turney, delivering the judgment of the court, laid down the following propositions: "I am of opinion with Judge Totten that the revisory jurisdiction extends to any ques-

tion of error or illegality in the proceedings which has the effect to prejudice the rights of a party. I also think the legislature has no power to say that any citizen shall be deprived of the right to have all questions touching his life, liberty, or property heard, passed upon, and determined by the regular and constitutional courts of the state. Such right is inalienable. It is unnecessary, in the present case, to go beyond the majority opinion in Wade v. Murry [2 Sneed. 56].   *   *   *   Although the boards may be officers of the state, and proposing to discharge their duties as such, yet, if they overleap the prescribed limits of the law under which they act, it is the right of those about to be injured to ask for, and the duty of courts to grant, a restraining relief. We think the petitions make prima facie cases for relief."

A bill in equity exactly similar to those in the principal cases was considered by Judge Matthews in Railroad Co. v. Bate, 22 Fed. 480. The board of equalizers was then called the board of examiners, and was composed of Gov. Bate and others. The preliminary injunction was denied, on the ground that the bill was prematurely filed. A lack of equity jurisdiction was a question which does not seem to have been suggested by the eminent counsel in that case, nor was it considered by the court, but the case was treated on the merits of the application.

These are mentioned specially because they were cases in the circuit court of the United States for the Middle district of Tennessee, while the Guenther Case, before Judge Key (19 Fed. 395), was an original suit in the circuit court of the United States for the Eastern district of Tennessee. In this last case, Judge Key, upon the proof before him, declared what he thought was a reasonable valuation at which to assess the property for taxation, and enjoined the remainder of the tax laid on the overvaluation. The decision in this particular was substantially similar to the decision of the circuit court of appeals for the Eighth circuit, referred to above.

In Wilson v. Lambert, 18 Sup. Ct. 217, 168 U. S. 611, the supreme court of the United States again affirmed the jurisdiction of courts of equity in this class of cases, saying: "Courts of equity undoubtedly have jurisdiction to hear the complaints of those who assert that their lands are about to be assessed and subjected to liens by a board or commission, acting in pursuance of the provisions of a statute which has been enacted under the forms of law, but which is unconstitutional, and therefore does not avail to confer the powers sought to be exercised. Dows v. Chicago, 11 Wall. 108; Railway Co. v. Cheyenne, 113 U. S. 516, 5 Sup. Ct. 601; Ogden City v. Armstrong, 168 U. S. 224, 18 Sup. Ct. 98; 2 Dill. Mun. Corp. (4th Ed.) § 922." And a precisely similar bill was entertained before Judge Jackson (afterwards Mr. Justice Jackson) in Morrow v. Telegraph Co., which on appeal was affirmed by stipulation. 154 U. S. 511, 14 Sup. Ct. 1149.

"A proper case for equitable interference is presented where the record of the tax proceeding is prima facie valid and regular, and extrinsic evidence is required to show its invalidity, so that there is not a full and adequate remedy at law to correct an abuse of the taxing power.   *   *   *   The illegality of the tax, or fraud in levying it, coupled with the fact that it may result in a cloud being cast upon complainant's title, presents a clear case for equitable interference. The jurisdiction to thus interfere for the prevention of a cloud upon the title resulting from an illegal tax assessment is regarded as pertaining to the well-settled powers of equity." 1 Spell. Ext. Relief, §§ 664, 665.

In reviewing a tax case on certiorari, the court is confined to the record of the board of equalization, and cannot examine evidence dehors that record, in the absence of special statutory provision for bringing in such evidence. In the ordinary case, therefore, certiorari is no adequate remedy. Ogden City v. Armstrong, 168 U. S. 237, 18 Sup. Ct. 98; Shelby Co. v. Railroad Co., 16 Lea, 413, 1 S. W. 32.

In Re Tyler, 149 U. S. 164, 13 Sup. Ct. 785, the supreme court said: "Manifestly the object of this legislation was to confine the remedy of the taxpayer for illegal assessment and taxation to the payment of taxes under protest, and bringing suit against the county treasurer for recovery back; but all this is nothing to the purpose. The legislature of a state cannot determine the jurisdiction of the courts of the United States, and the action of such courts in according a remedy denied to the courts of a state does not involve a question of power." The distinction, recognized by some of the cases, between arresting the assessment of

a tax and restraining its collection after it is assessed, is adverted to in the opinion in this case.

When constitutional provisions are self-executing, and when legislation is needed to give them effect, were questions considered in Railroad Co. v. Ihlenberg, 43 U. S. App. 726, 21 C. C. A. 546, and 75 Fed. 873.

In respect of legislation prescribing a tariff of rates, and the application of the fourteenth amendment as a limitation, Road Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, is a leading and instructive case.

As illustrating the purpose and effect of the fourteenth amendment, see 6 Am. & Eng. Enc. Law (2d Ed.) 965, and cases referred to. See, also, Fraser v. McConway & Torley Co., 82 Fed. 257; 1 Kent, Comm. (14th Ed.) *391, *392, and cases in notes.

In Munn v. Illinois, 94 U. S. 123, the court, discussing the effect of the fourteenth amendment, said: "The constitution contains no definition of the word 'deprive,' as used in the fourteenth amendment. To determine its signification, therefore, it is necessary to ascertain the effect which usage has given it, when employed in the same or a like connection. While this provision of the amendment is new in the constitution of the United States, as a limitation upon the powers of the states, it is old as a principle of civilized government. It is found in Magna Charta, and in substance, if not in form, in nearly or quite all the constitutions that have been from time to time adopted by the several states of the Union. By the fifth amendment, it was introduced into the constitution of the United States as a limitation upon the powers of the national government, and by the fourteenth, as a guaranty against any encroachment upon an acknowledged right of citizenship by the legislatures of the states." See, also, the recent case of Railway v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255.

In an interstate railway line or system, there would seem to be no insuperable difficulty in taking all the unlocated personal property actually used in the operation of the line, and distributing and apportioning the aggregate value on a mileage basis. This, added to the value per mile of so much of the line as lies within the state, would give such state a just portion of the entire value, besides localized property. The value of the franchise might be ascertained, and similarly distributed and apportioned, and thus the unit value reached. This might be estimated by net earnings and other conditions relating to the actual facts. If all the states traversed by the line would adopt a similar method, equitable results would follow; otherwise, more likely, injustice would be done. The difficulty of dealing with this last feature could not be denied. Substantially such a scheme of taxation was approved as valid in Railway Co. v. Wright, 151 U. S. 479, 14 Sup. Ct. 396.

As to the difficulty and uncertainty in dealing with intangible elements based on such data as the income, etc., on an interstate system, see People v. Clapp, 152 N. Y. 490, 46 N. E. 842. "It is of the very essence of taxation that it be levied with equality and uniformity, and that there should be some system of apportionment. Cooley, Const. Lim. 495." Bank v. Maher, 9 Fed. 885. This language is almost identical with that of the supreme court of Tennessee in the 9 Heisk. case referred to in the opinion.

"It is obviously unjust to make the gross earnings the basis of calculation, as is sometimes done. A large volume of business may signify large profits, or it may mean a loss; nor do extensive operations necessarily result from a large investment. On the other hand, a comparatively small investment in an operation of a line extending for a short distance through fertile and populous sections, and enjoying a monopoly of the business, may, on a much less volume of gross receipts, yield a large aggregate profit." 2 Spell. Priv. Corp. § 1117.

In Bank v. Maher, 9 Fed. 884, 20 Blatchf. 341, it had been decided, upon motion for a preliminary injunction, that the assessment in question was void for failure on the part of the assessors to comply with the statute. After the decision, an act of the legislature of the state of New York was passed, designed to cure the invalidity of the assessment, and the act was then relied on as a defense to the action. But the curative statute was declared void, on the ground that it was, in effect, a legislative assessment of a tax upon a body of individuals selected out of a general class, without apportionment or equality as between them and a general class, or as between themselves, and also without giving them any opportunity to be heard. The opinion was by Wallace, J. It was pointed out in that case that a tender of the amount justly due was required

only in cases where there was an excessive, as distinguished from a void, assessment. Bank v. Maher, 6 Fed. 417.

In Association v. Topeka, 20 Wall. 663, the court said: "The theory of our government, state and national, is opposed to the deposit of unlimited power anywhere. The executive, the legislative, and the judicial branches of these governments are all of limited and defined powers."

It was in McCulloch v. Maryland, 4 Wheat. 346, that Chief Justice Marshall said: "That the power to tax involves the power to destroy."

This destructive effect of the power to tax was referred to in Association v. Topeka, supra, the court saying: "A striking instance of the truth of the proposition is seen in the fact that the existing tax of 10 per cent., imposed by the United States on the circulation of all other banks than the national banks, drove out of existence every state bank of circulation within a year or two after its passage. This power can as readily be employed against one class of individuals, and in favor of another, so as to ruin the one class and give unlimited wealth and prosperity to the other, if there is no implied limitation of the uses for which the power may be exercised."

And in Vanzant v. Waddell, 2 Yerg. 260, decided 1829, Judge Catron (afterwards Mr. Justice Catron) said: "That a partial law, tending, directly or indirectly, to deprive a corporation or an individual of rights to property, or to the equal benefits of the general and public laws of the land, is unconstitutional and void, we do not doubt. * * * And every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were this otherwise, odious individuals and corporate bodies would be governed by one rule, and the mass of the community who made the law by another. The idea of a people, through their representatives, making laws whereby are swept away the life, liberty, and property of one or a few citizens, by which neither the representatives nor their other constituents are willing to be bound, is too odious to be tolerated in any government where freedom has a name." See Scott v. Donald, 165 U. S. 107, 17 Sup. Ct. 262.

The better opinion, probably, is that a court of equity can only declare an assessment illegal and void, or excessive, and restrain further action by injunction accordingly, leaving it to the legislature to correct or make a new assessment. Heine v. Levee Com'rs, 19 Wall. 655; State Railroad Tax Cases, 92 U. S. 575.