LOUISVILLE & N. R. CO. v. COULTER, Auditor, et al.

(Circuit Court, E. D. Kentucky. November 9, 1903.)

No. 396.

1. TAXATION—ASSESSMENT—PERCENTAGE OF FAIR CASH VALUE.

Evidence considered, and *held* to sustain the claim of a complainant that property in Kentucky which was subject to equalization by the State Board of Equalization under the statute was assessed for taxation for the year 1902 at not to exceed 80 per cent. of its fair cash value, notwithstanding the requirement of the state Constitution that all property shall be assessed at its fair cash value.

2. SAME—RAILROADS—METHOD OF VALUATION OF PROPERTY.

Where the railroad commissioners of a state, in fixing the valuation of the property of a railroad company for purposes of taxation by the capitalization plan at a sum upon which the net earnings of the company would pay an annual dividend of 6 per cent., took into consideration the earnings for the four preceding years, which made the assessed value greater than it would have been if based on the earnings for five years instead of four, and greater than it would have been if based on the average market value of the stock and bonds of the company for the preceding five years, they cannot claim that such assessment was less than the fair cash value, on the ground that, if the earnings for the last year alone had been considered, or the highest market value of the stock and bonds at any time during such year taken, the result would have been a higher valuation; the only reasonable rule to pursue in general in such methods of valuation being to take into consideration a series of years, not less than five.

3. SAME—KENTUCKY STATUTE.

The provision of the Kentucky revenue act of November 11, 1892, p. 302, c. 103, art. 3, § 5, as amended by Act June 9, 1893, p. 991, c. 217, § 4, that in the assessment of the property of a railroad company "that proportion of the value of the capital stock which the length of the lines operated, owned, leased or controlled in this state bears to the lines owned, leased or controlled in this state and elsewhere shall be considered in fixing the value of the corporate franchise of such corporation liable for taxation in this state," requires the taking into consideration of a line of road owned and operated by a second company, but which is controlled

by the company being assessed through its ownership of a majority of the stock of such second company.

**4. SAME—RIGHT TO ENJOIN COLLECTION OF TAX—UNDERVALUATION OF OTHER PROPERTY.**

In order to entitle one whose property has been fully valued for taxation to complain of an undervaluation of other property and to relief in equity by having his own valuation cut down to an equality with that of the property undervalued, it is essential that the undervaluation should have been intentional, and that it should have been systematic or habitual, relating to a large species of property.

**5. SAME.**

Where it was shown that the tangible taxable property of all kinds subject to equalization by the State Board of Equalization under the laws of Kentucky, which constituted 77 per cent. of the taxable property of the state, was assessed for the year 1902 at not to exceed 80 per cent. of its fair cash value by the local assessing officers and the Board of Equalization, a railroad company whose intangible property was assessed by the Board of Valuation and Assessment at its full cash value is entitled to maintain a suit in equity in a federal court to enjoin such board from apportioning and certifying for collection so much of the tax as is in excess of that imposed on other taxpayers, as in violation of its constitutional right to the equal protection of the laws.

In Equity.    Suit for injunction.

Helm, Bruce & Helm and T. B. Harrison, Jr., for complainant.

Henry L. Stone and William O. Davis, for defendants.

COCHRAN, District Judge.    This is a suit to enjoin the defendants, members of the Board of Valuation and Assessment for this state, from apportioning and certifying a portion of an assessment for taxation of the intangible property of complainant in this state for the year 1902. The amount of that assessment is $10,974,899.50, and that portion thereof is all over $4,017,194.66.    The ground upon which this relief is sought is that said assessment is based upon a valuation by defendants of complainant's entire property in this state at the sum of $33,788,-724.50, whereas it should have been based upon a valuation thereof at not exceeding $27,030,979.66; that is, 80 per cent. of the former sum. The mode of assessing the intangible property of a corporation subject to assessment is first to value its entire property in this state, and then to deduct therefrom the assessment of its tangible property made by the officials who have to do therewith.    The balance is the amount at which the intangible property should be assessed.    The tangible property of complainant in this state was assessed by the railroad commissioners for the year 1902 at $23,013,825.    This sum, deducted from the sum at which defendants have valued its entire property in this state for that year, leaves $10,974,899.50, the amount of said contemplated assessment of its intangible property.    Deducting it from the sum at not exceeding which complainant contends it should be valued, leaves $4,017,154.66, the portion thereof that is not complained of.

The reason why complainant contends that its entire property in this state should not have been so valued, but should have been valued at

¶ 4. Persons entitled to injunction restraining or damages for wrongful enforcement of tax, see note to Bayles v. Dunn, 54 C. C. A. 550.

See Taxation, vol. 45, Cent. Dig. § 1234.

not exceeding the lesser sum, is not that its said property was not of that value, but that the taxable property in this state which is subject to the jurisdiction of the State Board of Equalization, and which constitutes the bulk of such property, was assessed for that year after the assessment thereof had been equalized by said board not at its value, but at not exceeding 80 per cent. thereof.

The taxable property in this state may be divided into tangible and intangible. Tangible property may itself be divided into that owned by steam railroad corporations, distilled spirits, and all other tangible property. Intangible property subject to assessment is limited to that of certain enumerated corporations, including steam railroad corporations. It is assessed by the Board of Valuation and Assessment, of which defendants are members, and no other officials have anything to do with its assessment. Its mode of assessment has been heretofore indicated. The total assessment thereof, including that in question herein, for the year 1902, amounted to the sum of $24,059,211. The tangible property of steam railroad corporations is assessed by the railroad commissioners, and no other officials have anything to do with its assessment. The total assessment thereof for that year amounted to the sum of $51,944,384. Distilled spirits are assessed by said Board of Valuation and Assessment, and the total amount thereof for said year amounted to $16,209,856. All other tangible property consists of three classes, to wit, lands, town lots, and personalty. And personalty is divided into that subject to equalization and that not so subject; that not so subject consisting of cash, accounts, notes, bonds, and stocks. This kind of tangible property is primarily assessed by the assessors of the various counties. The assessment made by each assessor is subject to the supervision of the board of supervisors in each county, which has power and whose duty it is to change any assessment to what it should properly be. And the assessment of each county, save as to personal property not subject to equalization, is subject to equalization by said Board of Equalization, which has power and whose duty it is to equalize the assessment of the various counties. It has nothing to do with equalizing particular assessments. It has only to do with equalizing the total assessments of lands, town lots, and personalty, in so far as it is subject to equalization, in each county with each other, and with the total assessments thereof in the other counties of the state. The total assessment of this kind of tangible property subject to equalization for the year 1902 amounted to the sum of $534,417,279; that not subject to equalization amounting to $64,412,354. It is this latter kind of tangible property, in so far as it is subject to equalization, which, as the figures show, constitutes more than 77 per cent. of the taxable property of the state, that complainant contends was not assessed for the year 1902 at more than 80 per cent. of its value. Defendants dispute this contention, and claim that it was assessed at its full value. At the outset, then, it is to be considered and determined which of the parties hereto is correct in this matter. If the defendants are, nothing else remains to be considered, and that is an end of this case.

It will aid in the solution of this question to first take a historical survey of the legislation of this state as to how tangible property of the kind under consideration, in so far as it is subject to equalization,

should be valued in assessing it for taxation, and as to who should value it. Before the third Constitution of this state—that of 1850—the only official who had anything to do with the assessment of property for taxation was styled a "commissioner." He made the primary and only assessment thereof. There was no board of supervisors or board of equalization in those days. The law required that he should assess property at its "fair and full value." By the act of 1831 (Acts 1831, p. 173, c. 726) an innovation was made in requiring the person listing his property for taxation to value it, and make oath that the value fixed by him was a "true, full, and faithful value of the same, to the best of his or her knowledge and belief." But this requirement as to the taxpayer making oath to the value of his property did not remain long in force It was repealed by the act of 1838 (Acts 1837–38, p. 68, c. 585), which provides further that the commissioner, before entering upon the duties of his office, should take an oath that he would fix a fair and full value on all property listed for taxation. By the Constitution of 1850 provision was made for the office of assessor, as it has existed ever since, and by the Revised Statutes which went into force July 1, 1852, his duties were prescribed. He was required thereby to assess property at its "fair and full value." The taxpayer, in giving in his list, was required to make a statement as to its value; but it is doubtful, to say the least, whether he was required to make oath thereto. Provision was also made therein for the first time for the board of supervisors. It was to be composed of the judge and clerk of the county, and it was required to correct any errors of the assessor, whether in fact or in relation to the valuation of the property listed by him, and, if it was of the opinion that it had been incorrectly valued, to assess it at its "proper value." The assessor was required to attend the sessions of the board, and give evidence and information upon oath concerning the business before it when called on, and it had the power to compel attendance of witnesses before it to enable it to discharge its duties. The General Statutes which went into force December 1, 1873, re-enacted these provisions, save that they provided that the board of supervisors should be composed of three discreet taxpayers, citizens of the county, appointed by the county court, any two of whom, after being sworn, should proceed to discharge its duties. By an act of date May 10, 1884 (1 Acts 1883–84, p. 151, c. 1336), provision was first made for the State Board of Equalization. It was provided thereby that the board should be composed of one person, having the qualifications of an elector, from each congressional district, elected by the qualified voters thereof, and the Auditor of the State; and that it should equalize the assessments of property for taxation in the several counties of the state by adding to or deducting from the assessments of each of the three classes of property or to or from the aggregate assessments of said classes in each county such a percentage as might be deemed equitable and just in order to make the assessments of the different classes of property in each county and in the various counties even or equal. It was expressly provided that the board should not have the power to reduce the aggregate assessments in the state, or to increase it except in such an amount as might be reasonably necessary to a just equalization

Then came the act of May 17, 1886 (1 Acts 1885–86, p. 140, c. 1233), a comprehensive one on the subject of revenue and taxation. It substantially re-enacted the provisions of the Revised and General Statutes in relation to the assessment of property for taxation hereinbefore referred to, but contained no provisions in relation to the State Board of Equalization. It made, however, certain additions to the provisions of said earlier statutes. It provided that the clerk of the county should, on or before September 15th of each year— the date as of which assessments were thereafter to be made—make and certify to the assessor a complete statement of all conveyances made the preceding year in the county, showing the names of the parties, the date of the conveyance, and the consideration, a true and exact copy whereof was thereafter to be sent to the auditor with the assessor's book; that the assessor, before proceeding to list the property of a person, should administer an oath to him to the effect, in addition to the list he was about to give being true and complete, as before, that he would value his property at the fair cash value; that, before the county court granted the assessor a certificate of allowance for his services, he should take in open court an oath that he had not received a list of taxable property and returned same until the person rendering the list had made oath to the truth and value of same, and that in no instance had he assessed any property at a greater or less sum than he deemed the fair cash value of the same; that the board of supervisors, whose membership was increased to five intelligent, discreet housekeepers, appointed as before, should, before performance of its duties, take an oath that it would in each instance where the property had not been assessed at a fair cash value, increase or decrease the valuation so as to make it conform to its fair cash value; and that said board should, in each and every case where property had not been correctly valued, value and equalize the same, and in every case should so correct the assessor's book as to have the said book to show the cash value of said property. This is the first act in which the words "fair cash value" are used to designate the value at which said property should be assessed, and it is used therein as synonymous with the words "fair and full value" in the former legislation.

In the case of Spalding v. Hill, 86 Ky. 656, 7 S. W. 27, decided shortly after the passage of this act, to wit, February 11, 1888, the Court of Appeals of Kentucky construed and determined the constitutionality of the previous act of May 10, 1884. It grew out of the action of the State Board of Equalization in raising the assessment of Marion county as to lands 13 per cent. and as to personalty 30 per cent. It was contended that it was unconstitutional, because it made no provision for notice to the taxpayer of a contemplated raise in an assessment, in order that they might be heard in regard thereto. It was held to be constitutional, because it specified the time and the place of the meeting of the board. As to the power conferred on the board by that act, Judge Bennett said that it was "its duty to examine into the assessments of the several counties, and, in case the assessment of one or more counties is found to be relatively higher or lower than other counties,

to equalize the taxes among the several counties according to the value of the property therein." And again he said: "But they have not the power to increase or decrease the total valuation of the state. Their power is limited to equalizing." This decision was followed in three months by another act on the subject of a State Board of Equalization, to wit, the act of May 4, 1888 (1 Acts 1887-88, p. 209, c. 1562). This act covered the ground anew. It changed the membership of the board to one person of the qualification theretofore prescribed from each appellate district of the state, to be appointed by the Governor, with the auditor as an ex officio member. It provided that the various county clerks of the state should, on or before the 1st day of January in each year, make and file with the auditor, for the use of said board, a tabulated statement, sworn to by them, of all sales of the absolute fee-simple title of real estate, as shown by the deedbooks in their respective counties— town lots being kept separate—made within one year immediately preceding the 15th of September previous, stating the price paid, with the terms and conditions, the number of acres, and the assessment of same for that year, and, if only a part of a tract of land or town lot had been sold, giving a short description of same, and stating what proportion same was of such tract of land or town lot; and that, if any clerk should fail so to do on or before the 1st day of February in each year, he should be fined upon indictment not less than $50 nor more than $200. The provisions thereof in relation to the duties of the board were to the effect that it should adopt 69 per cent. of cash value as the standard to which the assessments of lands and town lots should be made to conform, and should raise such assessments thereof as were below that percentage to that standard and lower such as were above thereto; that in ascertaining the actual percentage of assessment to cash value in any case to know whether it was below or above the standard it should take the aggregate assessment of tracts of land or town lots, as the case might be, in the tabulated statement relating to such case, and calculate what percentage aggregate assessments were of the aggregate prices at which same were sold; time payments being reduced to cash on the basis of 6 per cent. discount; and that in equalizing the personal property subject to equalization it should add to or subtract from the assessment thereof the average per cent. added to or subtracted from the assessments of the lands and town lots for the same county. It was expressly provided that in any county where there had not been as many as five sales of land in the year immediately preceding the previous 15th of September the assessment thereof should remain as fixed by the local assessing officials, and that the same rule should apply as to town lots. But as to counties where there had been five or more sales of lands and town lots, or either, the board was not required to accept the percentage that the aggregate assessment of lands or town lots sold were of the aggregate prices at which they had been sold on a cash basis as showing absolutely the true percentage of cash value at which all the lands and town lots in such counties had been assessed. It was only prima facie evidence

thereof. It was provided that after the board had raised or lowered the assessment of any county in accordance with the percentage shown by the tabulated statement thereof it should give notice of such action to the county judge, that he might appoint not exceeding five witnesses to appear before the board and testify under oath in reference to its action; and that then the board should revise its action or not, as it might think just and proper. This latter act was amended by an act approved May 27, 1890 (1 Acts 1889–90, p. 170, c. 1903), by which it was provided that the county judge and county attorney, as well as the county clerk, should swear to the correctness of the tabulated statement as to sales; that the board should have authority to obtain and use any other evidence of values, and whether or not the property conveyed had been assessed at a greater per cent. of its actual value than in cases where property had not been conveyed; that the percentage at which property as to be equalized should be 70 per cent.; and that the per cent. to be added or subtracted in equalizing assessments of personalty should be the per cent. added to or subtracted from the assessment of lands alone.

Thus stood the law when the Constitution of 1891 went into force. It was in quite an inconsistent shape. The taxpayer was required to give his property in under oath at its fair cash value; the assessor was required to swear that he would assess it at that value, to so assess it; and, before he could get his pay, to swear that he had so assessed it; and the supervisors were required to swear that, if they found that the assessor had not so assessed it, they would correct his error, and to so assess it. On the other hand, the Board of Equalization was required to equalize it in masses at 70 per cent. of its fair cash value. That Constitution was a radical departure from the Constitution of 1850 in its provisions in relation to taxation. The former had few, if any, provisions on that subject. The latter had quite a number. Amongst them was one (section 172) prescribing the value at which "all property not exempted from taxation" should be "assessed for taxation," and a criterion of such value. That value was the "fair cash value," and that criterion was "the price it would bring at a fair voluntary sale." As to the effect of this constitutional provision on existing law, Judge Day, in the case of Louisville Trust Co. v. Stone, 107 Fed. 305, 46 C. C. A. 299, said:

"It established a rule for taxation inconsistent with the prior statutes, and must be taken as repealing those statutes which are in conflict with the constitutional provisions."

This could only have had reference to the provisions of the act of 1888 as amended by the act of 1890, for they were the only prior statutes prescribing a different rule, and therefore inconsistent or in conflict with that provision. It would seem, however, that it did not repeal those statutes in toto, but simply substituted a different standard of equalization, to wit, the fair cash value, instead of 70 per cent. thereof. This was so held by the Court of Appeals of Kentucky in the case of Louisville R. Co. v. Com. (Ky.) 49 S. W. 486. Judge Paynter there said:

"The act creating the Board of Equalization and Assessment is not in force in so far as section 172 of the Constitution and section 4028 of the Kentucky Statutes are in conflict therewith. In other words, the Board of Valuation and Assessment cannot equalize except upon a basis of the cash value of the property assessed."

The next Legislature after the adoption of said Constitution enacted a comprehensive law on the subject of revenue and taxation, which went into force November 11, 1892. Acts 1892, p. 277, c. 103. It contained a general provision (section 4020, Ky. St. 1903) to the effect that all property in this state not exempt from taxation should be assessed at its fair cash value, estimated at the price it would bring at a fair voluntary sale. The special provisions therein in regard to the taxpayer, the assessor, and the board of supervisors were substantially the same as in the said act of May 17, 1886, save that in each instance it was the fair cash value, estimated at the price it would bring at a fair voluntary sale, that the property was to be valued in assessing it; that the oath of the taxpayer was to be in writing, and signed by him, and the assessor was required to read it over to him before signing it, and to make oath beforehand that he would administer the prescribed oath to him, and afterwards that he had done so; and a penalty was prescribed for the assessor violating this requirement, and the taxpayer was made liable to punishment for false swearing if he made a false statement in his oath. No provision was contained in this act in relation to the State Board of Equalization.

And finally came the act of March 29, 1902 (Acts 1902, p. 281, c. 128). It, too, is a comprehensive one on the subject of revenue and taxation. It contains all the provisions of the acts of May 17, 1886 (1 Acts 1885–86, p. 140, c. 1233), and November 11, 1892 (Acts 1891–93, p. 277, c. 103), hereinbefore referred to, but it goes beyond them in that in article 16 thereof it covers the ground of a State Board of Equalization—the same covered by the acts of May 10, 1884, and May 4, 1888, as amended by the act of 1890. This article consists of the same provisions as the act of May 4, 1888, as so amended, save that as to the qualifications of the appointed members of the board it is provided that no person should be eligible to appointment who was under 30 years old, and that he should be a housekeeper, and the owner of real estate located in this state. Like the act of May 27, 1890, it provides that the board shall equalize assessments at 70 per cent. of fair cash value. Of course, in so far it is a violation of said constitutional provision. But in it we have a continuance of the legislative inconsistency of requiring the taxpayer and one set of officials to value property in assessing it for taxation at its fair cash value estimated at the price it would bring at a fair voluntary sale, and another set of officials to equalize the primary assessments thereof on the basis of 70 per cent. of the fair cash value of the property assessed.

Such, then, has been the legislation in this state since before the Constitution of 1850 as to the value at which and the persons by whom property, assessments of which have since May 10, 1884, been subject to equalization by the equalizers, should be assessed. The only period of time that there was valid legislation in existence provid-

ing for the assessment of said property at less than its full and fair or fair cash value was from May 4, 1888, the date when the second act in relation to the equalizers became effective, and September 28, 1891, the date as of which the present Constitution took effect. During this period the legislation, so far as it related to the primary assessments by the assessors and correction thereof by the supervisors, required, as it has always required, that they should be at the full and fair or fair cash value of the property assessed. It was only the legislation in relation to the equalizers requiring them to equalize said assessments after such correction, first at 69 per cent, and then at 70 per cent. of its fair cash value, that provided for the assessment of said property at less than its full and fair or fair cash value. Said legislation was regulative in its character. It is evidential also. It indicates that, though the legislation in existence when it was passed, and which had been in existence for many years prior thereto, provided said property should be assessed at its full and fair or fair cash value, it was not in fact so assessed in the aggregate at more than 70 per cent. thereof; for it is inconceivable that the Legislature would have provided for an equalization on the basis of 70 per cent. if said property was then being or had theretofore been assessed in the aggregate at a greater percentage of its full and fair or fair cash value. This indication that said property had not theretofore been fairly assessed is borne out by a statement of the Court of Appeals of Kentucky through Judge Bennett in the case of Spalding v. Hill, supra, decided three months before the passage of said legislation, as to the necessity which caused the passage of the previous act of May 4, 1884. It is in these words:

"It is the settled doctrine of this state that for the purpose of taxation property must be assessed according to its true value; that equality of burden is essential to the correct administration of the government. But it is a fact known by all that for years past the grossest inequalities have existed in the values fixed upon all kinds of property by the county assessors, and that the county boards of supervisors have failed to correct the evil. In some counties it is said that assessors secure their election by pledges made to assess the property in the county, or certain kinds of it, at a low value. In creating the State Board of Equalization the object was to correct this evil, and to have the assessment of taxes in the several counties equalized according to the value of the property therein, so that the state government might be supported by just and equal taxation."

Further, there is in the act of May 4, 1888, a note of helplessness and despair, to wit, that it was regarded by the Legislature that it was well-nigh impossible by mere legislation, no matter how stringent, to secure an assessment of said property at its fair cash value. It is hard to understand why it was not provided that the equalizers should exercise a supervision over the action of the assessors as corrected by the supervisors, and bring the assessment of each class of said property in each county up to its fair cash value, and in that way bring about an equalization on any other idea than that it was felt that this could not readily be brought about by mere legislation.

So forcible is the evidence thus afforded as to these two matters, confirmed, to a certain extent, as to one of them, by the opinion

of the Court of Appeals of Kentucky, through Judge Bennett, that it seems that it should be accepted as conclusive in regard thereto. This being so, the question which we have to determine, to wit, as to whether said property was assessed, after it had been equalized, for the year 1902 at its fair cash value, or at not more than 80 per cent. thereof, may be put in another form. It is this: Had section 172 of the Constitution of 1891 and the stringent provisions of the act of November 11, 1892, been able, by the year 1902, to accomplish that which the legislation prior to the act of May 4, 1888, had been unable to accomplish, to wit, to secure an assessment of said property at its fair cash value? Had those laws, by that time, become written in the inward parts of taxpayers and assessing officials, so as to bring about a change in their settled habit in the matter of assessing property for taxation—so settled that the Legislature felt forced to recognize it—a change from the habit of assessing at 70 per cent. of fair cash value to the habit of assessing at full and fair cash value? As to such a great change being thus brought about one cannot help but be sceptical, and the aid which this historical survey brings to the solution of the question in hand is in inducing this attitude of scepticism towards the claim that said property was assessed for the year 1902 at its fair cash value. This attitude is strengthened by the evidence as to how relative to fair cash value said property was assessed, after equalization had, for the years 1893, 1894, 1895, and 1896, which was subsequent to the taking effect of the Constitution of 1891 and the act of November 11, 1892. It consists of the affidavits and depositions of L. C. Norman, auditor for 1893, 1894, and 1895, and S. H. Stone, auditor for 1896, and the affidavits of J. S. Phelps, an equalizer for 1893, 1894, and 1895, John S. Murray, an equalizer for 1894, and L. C. Pritchard, Hancock Taylor, and Ben D. Ringo, equalizers for the years 1895 and 1896. These seems to be all the surviving members of the State Board of Equalization for those years. There is no other evidence bearing upon its action as to those years. It is to the effect that said board equalized the assessments of said property in accordance with the requirement of said statute of May 4, 1888, as amended by the act of May 27, 1890, the same as if it had not been affected by said constitutional provision and act of November 11, 1892; i. e., at 70 per cent. of its fair cash value. Hancock Taylor states that 80 per cent. of the prices at which the real estate sold according to the reports of the county clerks was assumed at its fair cash value, and the assessments were equalized on the basis of 70 per cent. thereof. As to the years 1897 and 1898 the evidence is not uniform. The question as to those years was involved in the case of Louisville Trust Co. v. Stone, supra, and in the opinion therein all the evidence introduced in that case bearing on that question is fully set forth. Some of it has been introduced herein. The conclusion of the court as to the effect of that evidence is binding upon this court. Though it denied the complainant therein the relief sought, it did not do so because its conclusion in regard thereto was not that said property had been assessed after equalization had for those years at its fair cash value. It was impressed by complainant's

contention that it had not been. In referring thereto Judge Day said, "There is much force in this argument." Its conclusion was simply that complainant's contention had not been made out "by the convincing proof required." As to the years 1899, 1900, and 1901, there is no evidence directly bearing thereon as to how, relative to value, said property was assessed after equalization had. But though, because of the conclusion in Louisville Trust Co. v. Stone, as to the years 1897 and 1898, and the absence of direct evidence as to the years 1899, 1900, and 1901, we cannot, so far as our investigation has thus far progressed, take position as to how said property for said years was assessed after equalization had, the evidence as to the years 1893, 1894, 1895, and 1896 is sufficient to warrant the conclusion that for those years it was so assessed at not more than 70 per cent. of its fair cash value. This fact we say strengthens the attitude of scepticism towards the claim put forward herein that for the year 1902 said property was assessed after equalization had at its fair cash value, induced by the historical survey we have made.

We are warranted, therefore, in entering upon a consideration of the evidence bearing upon the question as to the valuation at which said property after equalization had was assessed for that year from this standpoint of incredulity. That evidence, in our opinion, shows beyond question that it was so assessed at not more than 80 per cent. of its fair cash value. It is possible that the assessments have been worked up 10 per cent.—that is, from 70 to 80 per cent.—but certainly not higher than 80 per cent. That this is so results from a comparison of the total assessments of said property after equalization had for the year 1902 with the year 1891. However it may have been after the latter year because of said Constitution and act of November 11, 1892, it is certain that for said year said property was not assessed after equalization had at more than 70 per cent. of its fair cash value. The then existing law, as to whose validity there can be no question, required that assessments should be equalized on a 70 per cent. basis. There is no evidence tending to rebut the presumption that the law was complied with in this particular. L. C. Norman, auditor for that year, testified that it was. In the report of the equalizers for the year 1896, is this answer to certain criticisms of a "few public speakers and newspapers of the state"—evidently made in the campaign in the fall of 1895 for state officers—to wit:

"The principal charge brought against this board, and to which it objects, is, in effect, that 'unreasonable and unlawful additions have been made to the assessed valuation in the state, that revenue may be created to refill an empty treasury.' The facts and figures disproving any such charge are these: For the years 1889, '90, '91, and '92—the last four years under the law which requires all real estate to be assessed at 70 per cent. of its 'fair cash value'—the average equalized value of lands in this state was $237,888,310. It will be admitted that lands are very rarely, if ever, either assessed or equalized for taxation at more than the law requires. Then it is safe to assume that the average equalized value above given was not greater than '70 per cent. of the fair cash value' of lands in this state. Now, if $237,888,310 was only 70 per cent. of the average 'fair cash value' of said lands for the years 1889, '90, '91, '92, then it necessarily follows that the 'average fair cash value' of lands for

those years was $339.840.404, which amount is $85,023,275, or more than 33 per cent. greater than $254,817,129, the amount at which the board has this year equalized the value of the lands of the state for taxation."

Indeed, it seems to be conceded by defendants that said property was not assessed, after equalization had for the year 1891, at more than 70 per cent. of its fair cash value. Another fact which seems to be conceded is that there was as much property in quantity, and it was of as great a fair cash value, in 1902 as in 1891. There is no reason to contend the contrary. For some reason there was a less acreage of lands assessed in 1902 than 1891. In 1891 there were 25,095,554 acres and in 1902 24,416,479 acres, or 679,075 acres less. But the town lots were more. In 1891 there were 82,483 and in 1902 114,420, or 21,987 more. As to personalty subject to equalization, the only items as to which quantity is given are live stock, stores, diamonds, and steamboats. The quantity of live stock and diamonds was greater in 1902 than in 1891, and of stores and steamboats less. As to the comparative fair cash value of the assessable property subject to equalization of the two years the only evidence is affidavits of five individuals, residents of Louisville, and experienced real estate men, to the effect that the value of the lands in the state had increased from 1891 to 1902 20 to 25 per cent. Accepting as facts, therefore, that said property was assessed in 1891 after equalization had at not more than 70 per cent. of its fair cash value, and that in 1902 it was at least of as great a fair cash value as it was in 1891—both of which are practically conceded by defendants—a comparison of the assessments after equalization had for the two years yields this result:

For the year 1891, the assessments of the different classes were as follows, to wit:

| | |
|---|---|
| Lands | $236,133,808 |
| Town lots | 155,496,486 |
| Personalty subject to equalization | 89,300,329 |
| Total of all | $480,930,623 |

For the year 1902, they were as follows, to wit:

| | |
|---|---|
| Lands | $258,040,303 |
| Town lots | 203,819,427 |
| Personalty subject to equalization | 72,557,539 |
| Total of all | $534,417,269 |

If, then, $480,930,623 was 70 per cent. of the fair cash value in 1891, then $687,043,747 was the full fair cash value. Eighty per cent. of the latter sum is $549,634,997.60, or $15,217,718.60 more than the assessment for the year 1902. Or, limiting the comparison to the assessments of lands, the largest of the three classes, and making it by the acre, we have this result: Lands after equalization had were assessed in 1891 at $9.58 per acre, and in 1902 at $10.57 per acre. If $9.58 per acre was 70 per cent. of the fair cash value of lands in 1891, then the full fair cash value was $13.68 per acre. Eighty per cent. thereof is $10.94 per acre, or 37 cents per acre more than in 1902. In the year 1896, when, in defense of the attacks made on it the previous fall, it was shown by the equalizers how

favorable to the taxpayers the assessment of that year had been as compared with the assessment of 1891, the assessment of lands was at $10.81 per acre, or 24 cents per acre more than 1902. The total assessment of personalty not subject to equalization in 1891 was $55,941,616, as against $64,412,354 in 1902.

The conclusion announced as to the question in hand results also from a consideration of the evidence bearing more directly on it. There were furnished to the equalizers for use in making the equalization for the year 1902 tabulated statements as to lands from 116 of the 119 counties of the state, and as to town lots from 112. After the equalizers had purged them of such sales as they had reason to believe were for fictitious considerations, of commissioners' sales, of exchanges, and of conveyances for natural love and affection, the number of sales of land exceeded 9,500, of which over 4,000 were cash sales, and of town lots exceeding 7,250, of which over 2,275 were cash sales. There is no good reason to doubt that the sales that were not entirely for cash were, in so far as not for cash, for that which was equivalent thereto, to wit, interest-bearing notes. The lowest number of sales from any one county was 12 of lands alone from Jackson county. In 77 of the 115 counties furnishing tabulated statements as to lands the percentage that the total of the assessments of the lands sold was of the total of the prices at which same sold was 80 and under, and in 39 it was over 80. In 24 of the latter it was over 85; in 12 over 90; in 5 over 95; in 2 just 100; and in three over 100, the percentages of which 3 were, respectively, 114, 116, and 133. In 1 of the 77 counties where the percentage was 80 and under it was under 50, to wit, 46; in 8 it was under 60; in 24 it was under 70; in 67 it was under 80; and in 10 it was just 80. In 67 of the 112 counties furnishing such statements as to town lots the percentage that the total of the assessments of the town lots sold was of the total of the prices at which same sold was 80 and under, and in the other 45 it was over 80. In 28 of the latter the percentage was over 85; in 15 over 90; in 11 over 95; in 6 just 100; and in 3 over 100, the percentages of which 3 were, respectively, 104, 120, and 149. In 2 of the 67 counties where the percentage was 80 and under it was under 60; in 14 it was under 70; in 52 it was under 80; and in 15 it was just 80. In 29 of the counties furnishing such statements as to both lands and town lots the percentage was above 80 as to both; in 6 of these the percentage was exactly the same as to both; and in 13 thereof the percentages were within 1 and 2 per cent. of each other. This is what these tabulated statements show as to the action of the local assessing officials as to lands and town lots sold in the counties furnishing them. There is evidence to the effect that in some, if not in many, of those counties lands and town lots not sold were assessed at a less percentage of fair cash value than those that were sold; or, in other words, that those sold were purposely assessed at a greater percentage than those not sold, in order to affect the action of the equalizers, and prevent them from raising the assessment of the county in which it was done. That in the course of the assessment of property for taxation in this state local assessing

officials have so acted as to prevent their respective counties from bearing their just proportion of the burden of state taxation was directly charged by the Court of Appeals through Judge Bennett in the case of Spalding v. Hill, supra. It was this fact that brought about the creation of the State Board of Equalization. That soon after its creation it was realized that lands and town lots sold might purposely, for the reason stated, be assessed by said officials at a greater percentage than lands and town lots not sol l is evident from the provision in the act of May 27, 1890, that the equalizers were authorized to obtain and use other evidence than the tabulated statements as to whether property not sold had been assessed at as great a percentage of its actual value as that sold. That in fact the assessments of lands and town lots sold were assessed at a greater percentage than those not sold for the year 1902 in certain of the counties is shown by the evidence. An assessor for a certain county, whose term of office covered the years 1898, 1899, 1900, and 1901, and who, therefore, made the assessment for the year 1902 in the fall of 1901 for his county, states in an affidavit that during his term of office it was the rule to assess the real estate in his county at about 60 per cent. of what it would, in the opinion of the assessor and supervisors, bring at a fair voluntary sale—this being supposed to meet the constitutional and statutory requirement of fair cash value; that the only exception to this rule was in the case of transfers of real estate; that this property was assessed at 80 per cent. of the purchase price for the year in which the transfer was made, and that the next year the assessment was lowered to the 60 per cent. basis. The object intended to be accomplished by this method of procedure is thus stated by him:

"The object of this was to make a showing on the transfers which would keep the State Board of Equalization from raising the entire county; it being deemed good business to let a few transfers bear for one year the increase, rather than the entire assessable property of the county."

Still further, the chairman of the equalizers for the year 1902 on direct examination testified that sometimes the transfer sheets were doctored by the supervisors or by the assessor of a county, and rendered wholly worthless as evidence before them; and, when asked on cross-examination as to what he meant by saying that certain transfer sheets had been doctored by said officials, he testified that those officials had concluded that this element of evidence some-times led to counties being raised by the equalizers, and, in order to obviate this, the assessor, when he found that a man had bought a piece of property for a certain price—say, $2,500—he would insist on the purchaser listing it at exactly what he had paid for it, and where that was overlooked by the assessor it was attended to by the supervisors; that he was sure that in the year 1902 there were several counties that had been listed exactly at the prices recited in the transfers; and that his board "rapped the knuckles" of those fellows about the matter, and indicated that they could not deceive it in that way. This testimony is concurred in by that of other of the equalizers. And in their report for the year 1902 the equalizers have this to say concerning this practice, to wit:

"We desire also to call attention to the injustice practiced in some of the counties of the state of listing the lands and lots sold during the year at a valuation out of any proportion to the valuation fixed upon the other lands and lots in the same county. The price which real estate in a community brings upon the market affords a very fine index to the correct valuation of property in that locality, and should greatly aid the assessor and supervisors in arriving at a fair valuation not only of the property transferred, but of other property similarly situated. It is manifestly unjust, however, to require the owner of real estate which has been sold during the year to list it at its full cash value, and at the same time allow his neighbors, with property equally valuable, to escape with valuations grossly out of proportion. Nor does this injustice in any way enable the counties practicing it to escape detection by this board, where their other property is not valued up with the transferred realty. By a system gradually perfected and elaborated by years of experience and study of the question, this board has found it possible always to detect an effort to escape the just operation of the law by this species of 'doctoring' the list of transferred property. The custom is so manifestly unjust both to a class of taxpayers and to this board that we trust this year the supervisors will see that the real estate not sold in the several counties is listed as well as that portion of it which is transferred."

Just to what extent the assessments for the year 1902 were doctored in this way the evidence does not disclose. The fact that in as many as 29 of the counties where the percentage of assessment to fair cash value exceeded 80 this applied to both assessment of lands and town lots, that in 6 of these the assessments of lands and town lots were exactly of the same percentage, and in 13 others they were within 1 and 2 per cent. of each other, is calculated to make one suspicious as to the assessments of a large majority of the counties whose percentage exceeded 80. But that the doctoring was not confined to those counties whose percentage exceeded 80 is shown by the affidavit of the assessor referred to, the percentage of whose county, according to his statement, was 80 as to all real estate sold, but according to other evidence in the record was 78 as to lands and 75 as to town lots.

In view, then, of the presence in the assessments of lands and town lots sold and embraced in the tabulated statements of this element of doctoring, it is reasonable to conclude that in but few, if any, of the counties furnishing such statements, were the assessments of lands and town lots not sold by the local assessing officials at a greater percentage of fair cash value than the average percentage of fair cash value at which all the lands and town lots sold in all of said counties were assessed. This percentage may be ascertained in either of two ways. One is by adding together the percentages of the various counties, and dividing their sum by the total number of counties. According to this method the average percentage as to lands was 77 and as to town lots 80. The other is by adding together the prices and assessments of all the lands and town lots sold, and ascertaining the percentage that the sum of the latter is of the sum of the former. The total of the prices of the lands sold was $13,235,249, of which $3,917,874 was for cash sales; and the total of the assessments of said lands was $10,381,009, or 78 per cent. of the former sum. The total of the prices of town lots sold was $10,257,710, of which $1,827,189 was for cash sales. The total of the assessments of said town lots was $8,140,721, or 79 per cent.

of the former sum. So that the average percentage, according to this method, is 78 as to lands and 79 as to town lots.

It is likewise reasonable to conclude that in those counties furnishing tabulated statements personal estate subject to equalization was assessed by the local assessing officials at no greater percentage of fair cash value than real estate, and that in those counties not furnishing such statements, of which there were three that furnished no statement as to lands and seven that furnished none as to town lots, all of the assessable property subject to equalization was assessed at no greater percentage of fair cash value than either of the average percentages given above. The upshot of this line of reasoning, therefore, is that, so far as the action of the local assessing officials was concerned in relation to the assessment for 1902, but little, if any, of said property outside of that whose assessments were doctored in the manner indicated, was assessed by them at a greater percentage of fair cash value than 80.

Then, as to the action of the equalizers in relation thereto. Heretofore the tabulated statements have been availed of to determine the percentage of fair cash value at which the real estate embraced in them was assessed by the local assessing officials, and as a basis of inference as to the percentage of fair cash value at which the real estate not embraced in them and personal estate subject to equalization was so assessed. They may be availed of for another purpose, and that in connection with the matter in hand; i. e., action of the equalizers. They contained, after being purged as aforesaid, a statement of the cash prices which the lands and town lots embraced in them brought at fair voluntary sales, and hence show the fair cash value thereof. If, then, the average fair cash value of the lands and town lots not embraced in them can properly be assumed to be the same as the average fair cash value of the lands and town lots embraced in them, the fair cash value of all the lands and town lots in each of said counties can be readily obtained. Having in this way obtained the fair cash value of all such lands and town lots, the total assessments thereof after equalization had can be compared therewith, and the action of the equalizers as to the percentage of fair cash value at which they put the assessments can be determined. Pursuing this course, the result is that in all but 17 of the 116 counties furnishing tabulated statements as to lands sold for the year 1902 the assessments of lands therein after equalization had were 80 per cent. and under of the fair cash value thereof. As to the 17, a comparison of the final assessments of lands therein with such assessments thereof for the year 1891 and with the average of the assessments thereof for the previous five years indicates that the average of the fair cash value of the lands sold therein was below the average fair cash value of all the lands of said counties, just as undoubtedly in the counties where the percentage was greatly less than 80 the average of the fair cash value of the land sold must have been greater than the average fair cash value of all the lands of said counties. This indicates that in all cases the average fair cash value shown by the tabulated statements cannot be accepted as the average fair cash value of all the lands and town lots in the counties fur-

nishing such statements, and that, therefore, a comparison of the final assessments of all the lands and town lots in such counties with the fair cash value thereof, ascertained in this way, cannot be accepted as showing the exact percentage of fair cash value at which the lands and town lots were assessed after equalization had in every county. But it is reasonable to conclude that in but few, if any, counties the percentage that the final assessments were of the fair cash value of the lands therein exceeded but little, if any, the average of all the percentages ascertained in this way. The average of all such percentages was 70. The record does not disclose the separate percentages as to town lots for the counties furnishing tabulated statements ascertained in this way. But the average thereof is shown to have been 82. This average is slightly in excess of 80, but, in view of the other circumstances bearing on the action of the equalizers, it is not out of the way to treat the percentage as to town lots after such action was had at not exceeding 80. It is reasonable to conclude that personalty subject to equalization in such counties, and property subject thereto in counties not furnishing tabulated statements, were assessed after equalization had at not exceeding 80 per cent. If so, then all the property in this state subject to equalization after equalization had was assessed for the year 1902 at not more than 80 per cent. of its fair cash value.

But a comparison of the assessment of 1902 with that of 1891, and the line of reasoning just pursued, are not the only considerations that lead us to the conclusion which we have announced. It is what one would expect from the course of procedure followed by the equalizers as shown by the evidence. So far as they made use of the tabulated statements at all in determining what their action should be, it was upon an 80 per cent. basis; i. e., they treated 80 per cent. prices shown by the statements as the fair cash value of the lands and town lots embraced in them, and compared therewith the assessments thereof by the local assessing officials in order to determine the percentage of fair cash value at which they had made their assessments. This they did in every case. The evidence is uniform to this effect. Such is the testimony of 6 of the 7 appointed equalizers, of the auditor, of 2 of the secretaries of the board, and of 46 of citizens of 28 different counties, who appeared before the equalizers to protest against tentative action on their part. There is no evidence to the contrary. But as a matter of fact they made but little use of the tabulated statements, even on this 80 per cent. basis. Instead of using these statements, the main guides they availed themselves of in determining what their action should be were the previous years' assessments, and the average of the previous five years' assessments, or of the previous four years' assessments, and that of 1902. The evidence does not make clear which of these two alternatives is true. That such was their course of procedure we know from their own statements in this case under oath and a detailed consideration of their work. Their testimony in regard to the tabulated statements is as follows: One equalizer testified that those statements were very little help to them, and afforded very little information; another that he had never, in his work on the

board, considered them of much importance, but considered them very unreliable and misleading; another that they made up their minds that they were unreliable; another that they made very little use of them, and did not have much faith in them; and another that they did not consider them very valuable. As to whether their characterization of these statements is justified by anything shown definitely in regard to them will be considered further on. Then, as to what a detailed consideration of their work shows. Take the 77 counties of the 116 furnishing statements as to lands where the percentage was 80 or under. There were only 10 of them just 80; the other 67 were under 80. We have no account of action as to 3 of them by the equalizers. They did not raise all of the other 64 to 80, which they would have done had they been controlled by the tabulated statements on the 80 per cent. basis. There were 16 of these 64 under 80 which they did not raise at all. In all of these 16 save 1 the assessments as made by the local assessing officials were the same or greater than the previous year's final assessment. On the other hand, there were 48 of the 64 under 80 which they did raise. In 32 of these 48 counties the assessments as made by said officials were less than the previous year's final assessment. They raised 6 of them not as high as that assessment, 11 of them just as high, 9 of them only 1 per cent. higher, 2 of them just 2 per cent. higher, and only 4 of them more than 2 per cent. In the case of these 4 the assessments so raised were considerably less than 80 per cent. of the prices shown by the statements. In only 16 of said 48 under 80 which they did raise were the assessments as great or greater than the previous year's assessments. In one half of these the assessments were greatly less than 80 per cent. of said prices, and the other half, which were not so greatly less, were raised just to 80 per cent. As to the 10 that were just 80, no raise was made as to 8 of them. In these the assessments as made by local officials were as great or greater than previous year's assessments except in but one case, and it was just 2 per cent. less. The other two were raised, and the assessments in these cases were less than previous year's assessments. The equalizers raised one just to that assessment and the other short of it. Then take the 39 counties of the 115 furnishing statements as to lands which showed a percentage in excess of 80. In 19 of these there was no raise made, and in all of these but 3 the assessments as made by said officials were as great or greater than the previous year's assessments. Where greater, they were, as a rule, only slightly greater. In 2 of the 3 that were not as great they lacked only 1 per cent. of being as great. In the other 20 of said 39 counties a raise was made, but in all but 1 of these assessments as made by said officials were less than the previous year's assessments. As a rule, the 19 that were less were raised to the previous year's assessments. Only 4 were raised to more than these assessments. Of these 3 were raised 1 per cent. and the other 2 per cent. Or, putting the matter in another way: In 42 counties no raise was made at all, and of these only 5 were not as great or greater than the previous year's assessments. In 70 counties a raise was made, and of these only 17 were as great or

greater than the previous year's assessments. The other 53 in which raises were made were less than the previous year's assessments, and of these 34 were not raised greater than said previous year's assessments, 12 were raised 1 per cent. greater, 3 were raised 2 per cent. greater, and only 4 in excess of 2 per cent. greater.

The result of this detailed consideration of the work of the equalizers in relation to lands is to bear out their testimony that they gave but little effect to the tabulated statements, even on the 80 per cent. basis, and to show that their action was practically controlled and determined by the previous year's assessment. A like consideration of their work as to town lots will show substantially the same result, and a comparison with the five-year average as to both lands and town lots will not differ greatly from the comparison with the previous year's assessment.

The attitude of the equalizers towards previous assessments, and how they regarded them, is indicated by the testimony of one of them that they assumed that property had theretofore been assessed at its fair value, and of another that they presumed that it had been assessed in previous years on a 100 per cent. basis. How unwarranted this assumption or presumption was is shown by the consideration that in previous years down to and including the year 1896— for at least four years after the Constitution of 1891 and the act of November 11, 1892, went into effect—property subject to equalization had been assessed at not more than 70 per cent. of its fair cash value; that the evidence does not warrant the conclusion that between 1896 and 1902 there was any material change in the percentage of valuation at which property was assessed; and that if in those years the equalizers acted upon the same assumption or presumption, and looked back to previous years' assessments, rather than to the tabulated statements, as the guides for their action, property for said years as well as for the previous years could not have been assessed at its fair value, or on a 100 per cent. basis, but must have been assessed at not much, if any, greater per cent. of its value than 70 per cent.

It is questionable whether the equalizers had the right to make use of these previous years' assessments to any extent in determining what their action should be. If there is any authority at all for their use thereof for this purpose, it is to be found in the provision in the act of May 27, 1890, incorporated in section 6, art. 16, p. 388, of the act of March 29, 1902, that the equalizers should have authority to obtain and use other evidence as to values than said tabulated statements. But if authority so to use said previous years' assessments was thus conferred upon the equalizers, it certainly was not intended that they should practically set aside the tabulated statements, and depend almost entirely upon previous years' assessments, in determining what their action should be. It was expressly provided that, if there had not been as many as five sales of land in any county, the assessment of lands and personalty should remain as fixed by the local assessing officials, and that the same rule should apply as to town lots. It could not have been intended that, where there were not the requisite number of sales, there was no jurisdic-

tion to act at all, and yet, where there was that number or more, the equalizers had the right to disregard them, and be controlled in their action by previous assessments. The importance attached to them is evidenced by the provisions made to secure their accuracy And one cannot avoid the conviction that, where they were accurate and genuine, it was intended that they should be well-nigh controlling. This method of determining fair cash value was in existence at the adoption of the Constitution of 1891, and when the test of fair cash value was prescribed therein to be the price which property would bring at a fair voluntary sale it is reasonable to infer that this method of determining that fact was had in view, and thereby sanctioned. That instrument was the beginning of a new era in the matter of taxation in this state. It contemplated a change in the value at which property should be assessed for taxation, and it is inconsistent with this view that thereafter assessing officials should look back at former years' assessments, and be governed by them in determining how, relative to value, property should be assessed.

The evidence discloses no justification for the treatment afforded these statements by the equalizers, or for the characterization of them made in their testimony herein. One accounts for their placing them upon the 80 per cent. basis, so far as they used them at all, by the fact that in them were sales and conveyances of the kind of which they purged them as hereinbefore stated. This, however, will not do, for they were not put on that basis until after they had been so purged. Another accounts for their action in this particular on the ground that many of the sales were upon time, and it did not appear in many, if not in a large majority, of instances that the deferred payments bore interest. Neither will this do. In only two instances did it appear affirmatively that the deferred payments bore no interest. As a rule, the statement as to the terms of payments of the consideration was briefly "cash and notes" or "cash." It is reasonable to infer, nothing else appearing, that these notes bore interest, and hence were equivalent to cash.

It is to be noted that in the report of the proceedings of the equalizers for the year 1902 a communication is addressed to the county clerks, and their attention is called to the provisions of the act of March 29, 1902, prescribing their duties in relation to the equalizers. They are called upon to carefully, accurately, and promptly make out and furnish to the auditor the tabulated statements; but nowhere is their attention directed to the fact that these statements which had been furnished were not sufficiently definite as to the terms of payment of the consideration so as to enable the equalizers to determine the cash prices at which the property listed had been sold, and requesting them to make them more definite in this particular. It is hard to understand why, if the equalizers had felt much difficulty along this line, they would not have directed the attention of the county clerks to it, in order that it might be removed as to the future work of the equalizers. But if either of these two reasons, or any other conceivable one, was sufficient justification for the equalizers concluding that 80 per cent. of the prices at which the real estate was represented as having been sold was the fair cash value

thereof, they showed by their action that they did not put much faith in any such conclusion. In many of the counties where the percentage was under 80 they did not raise their assessments at all, and in but few of those that they did raise did they raise them to the 80 per cent. Then, if this conclusion was warranted, all counties whose percentage was above 80 should have been lowered to that percentage. As stated, there were 39 counties that were above 80 per cent. as to land and 45 as to town lots, yet not in a single instance did they lower the assessment of a county. That they did not do so shows that they could not have had any faith in their conclusion that 80 per cent. of the prices at which the property sold was the fair cash value thereof. There is less reason in the evidence for their having set them aside entirely, as they seem to have done substantially. The only possible justification for their having done so was the testimony of witnesses before them, sent there by the county judges in response to tentative action, of which notice was given as provided in the statute. But, though they testified fully in regard to their action, no one of them has referred to any reason given by any witness as to why any tabulated statement should be set aside. According to the testimony of the chief secretary of the board, none of these witnesses were sworn, and their main function seems to have been as advocates, rather than witnesses. In the report of the board they are generally termed a committee, rather than witnesses. Then they appeared from 57 counties only, and the equalizers, in their treatment of these tabulated statements, made no difference between those from counties sending witnesses and those not sending them. The fact, then, that in determining what their action should be, the equalizers, so far as they used said statements at all, did so on the 80 per cent. basis, and that their action was not affected by them even on this basis, but was principally controlled by the previous assessments, was calculated to bring about the very result which the other evidence shows was brought about, and itself conduces to show that it was brought about.

Such, then, are the reasons upon which we base our conclusion that the property in this state subject to jurisdiction of the State Board of Equalization was assessed after equalization had at not more than 80 per cent. of its fair cash value. The only things to the contrary are the testimony by affidavit of 25 assessors, stating in general language that they assessed the property of their counties at the fair cash value thereof, and the testimony by deposition of 6 of the 7 appointed equalizers that they equalized the assessments subject to their jurisdiction on the basis of the fair cash value of the property assessed. Testing the truth of the testimony of these assessors by the showing made by the tabulated statements as to the percentage which the assessments of the lands and town lots embraced in them bore to the cash prices at which they sold, we have this result: In only one county was the percentage as much as 100. As to this county the percentage was that much as to both lands and town lots, and according to the testimony of the equalizers the assessment as to this county was doctored in the manner indicated. In the other counties the percentages as to land range from 60 to 93

per cent., only 7 of them being above 80 per cent.; and as to town lots they range from 68 to 90 per cent., only 11 of them being above 80 per cent. Testing that testimony as to lands by the percentage of assessment to fair cash value on the basis that the lands sold were of the average cash value of all lands in the county, we have this result: In no county was the percentage as much as 100, and in but three of them was it in excess of 80, being as to those three, respectively, 83, 93, and 94. And, strange to say, of the assessors thus testifying is the one who in another affidavit, given on behalf of complainant, stated that the assessment of the real estate sold in his county had been doctored by him as heretofore stated.

Then as to the testimony of the equalizers. However sincere they may have been in their belief that they equalized the assessments on the basis of the fair cash value of the property assessed, and by whatever assumptions or presumptions they induced such belief on their part, it seems to us that it is as certain as certain can be that they did not do so, and that, on the contrary, they equalized them on the basis of not exceeding 80 per cent. Our real conviction is that it is liberal to say that they equalized them on a basis as great as that.

But, in order that complainant may be entitled to the relief which it seeks, it is not sufficient that such be the fact. It is essential that its property in this state should have been valued by the Board of Valuation and Assessment at its full fair cash value in the process of determining the amount at which its intangible property should be assessed. Here complainant and defendants exchange positions. The former contends that its said property was so valued; the latter that it was not. This dispute, therefore, demands settlement at our hands.

The determination of the fair cash value of that portion of complainant's property located in this state cannot be readily accomplished. All that can be expected is an approximation more or less near thereto. Its determination involves the determination of two sub-matters. One is the fair cash value of all complainant's property, and the other the proportion thereof belonging to this state. Two ways of ascertaining the fair cash value of such properties have been resorted to in the course of valuing them for taxation. One is known as the "stock and bond plan," and the other as the "capitalization plan." According to the former, the market value of the stock and bonds of the corporation owning the property is ascertained, and, as such stock and bonds represent every interest in the property, such valuation is assumed to be the value of the property. According to the other, the net income derived by the corporation from the property is ascertained, and such sum as that is 6 per cent. of is assumed to be such value. The particulars in which these two methods, especially the stock and bond one, do or may come short of leading one to the fair cash value of the property, have been fully set forth by Judge Clark in the case of Railroad & Telephone Co. v. Board of Equalizers (C. C.) 85 Fed. 311, and by Judge Grosscup in the case of Chicago U. T. Co. v. State Board of Equalization (C. C.) 112 Fed. 607. In the former case Judge Clark expressed preference for the capitalization plan. Both have been used by the Board of Valuation and Assessment of this state. The capitalization

plan was pursued by it in making the assessments of the Henderson Bridge Company, involved in the case of Henderson Bridge Co. v. Com., 99 Ky. 623, 31 S. W. 486, 29 L. R. A. 73; Same v. Negley (Ky.) 63 S. W. 989. The stock and bond plan was pursued in making the assessment of the property of the Covington & Cincinnati Bridge Company, involved in the case of Com. v. Covington & C. Bridge Co. (Ky.) 70 S. W. 849. In the latter case Judge Hobson, in referring to the action of the board in the first Henderson Bridge Case said:

"But this action of that board did not prevent another board for another year from adopting a different line if the law warranted it. There is nothing, therefore, in any of these cases, determining that the board did not have a right to adopt another basis of assessment."

In the view we take of this case we do not find it necessary to express a preference between these two plans. It does seem to us, however, reasonable to hold that, if the stock and bond plan is adopted, the Board of Valuation and Assessment should, as a rule, not confine itself to the market value of the stock and bonds at the moment of assessment, or even to the average market value thereof for a year previous thereto, or, if the capitalization plan is adopted, it should not, as a rule, confine itself to the net income for the year previous to the date of assessment; but that in each case it should look to the average showing made by a series of years—say, not less than five. This because this is what we conceive that one proposing to purchase such a property would do in order to determine its fair cash value, and what he could afford to give for it, and we think a board of valuation and assessment in making a valuation thereof for taxation should place itself in the shoes of such a person. It should always hold before itself that the ultimate thing which it is attempting to do is to determine the fair cash value of the property in question, and that the market value of the stock and bonds or the net earnings are simply aids to that end. And that either may be a real aid to such an end, it is essential that it should cover a sufficient period to show the settled conditions of things. In the decision of Judge Grosscup, referred to above, he expressed the opinion that under the stock and bond plan a five-year period should be adopted. In saying that the showing of a series of years—and that for as many as five years—should be looked to, we would not be understood as laying down any hard and fast rule to be applied in every case. It is possible that in some cases it would not be reasonable so to do, and perhaps it is beyond our province to be laying down any rules for the guidance of said board. All that we would be understood as saying is that, in our opinion, it is reasonable, as a rule, to pursue such a course in making the valuation of such property for taxation, and that, if such a course is pursued, it cannot be said, nothing else appearing, that the result does not represent the fair cash value of the property.

Then, as to the plan to be pursued in ascertaining the proportion of the fair cash value of the entire property of complainant which properly belongs to this state. If the mileage of its property in and out of this state were of like character and equal value, no doubt

the proper plan to be pursued would be to ascertain what proportion the mileage in the state was of the entire mileage, and adopt that proportion of the fair cash value of the entire property as the fair cash value of that part in this state. The Legislature of this state at first acted upon the idea that in all cases of this kind the mileage in and out of the state should be assumed to be of like character and equal value, and by section 5 of article 3 (chapter 103, p. 302) of the act of November 11, 1892, provided as follows:

"That proportion of the value of the capital stock which the length of the lines operated, owned, leased or controlled in this state bears to the lines owned, leased or controlled in this state and elsewhere shall be the value of the corporate franchise of such corporation liable for taxation in this state."

But by the amendment thereto of June 9, 1893 (Acts 1893, p. 991, c. 217, § 4), it was enacted that the words "considered in fixing" should be inserted after the words "shall be," so that it was provided that such proportion should be considered in fixing such value, rather than should be the value thereof. This amendment was, no doubt, passed in order that the board should not be bound absolutely to accept such proportion of the cash value of the entire property as the value of that part of it in this state, and might be at liberty, in determining the value of such part, to consider the difference in character and value, if any, between the mileage in and out of this state.

Having thus indicated the matters to be determined in ascertaining the fair cash value of complainant's property in this state and the methods to be pursued in determining them, it is in order now to consider whether the defendants valued said property at its fair cash value. They put the fair cash value of the entire property at the sum of $129,566,663. They ascertained such to be its fair cash value on the capitalization plan, and in pursuing this method took into consideration the average net earnings of the entire property for the preceding four years; in other words, they capitalized the average net earnings for said four years. So doing, it gave the sum at which they valued the entire property. Had they taken into consideration the average net earnings for five years, and capitalized it, the valuation of the entire property would have been $7,625,447 less than what they put it at. Had they adopted the stock and bond plan, and taken into consideration, according to showing made by Financial Chronicle, as stated by counsel for complainant in their brief, the average market value of the stock and bonds for the preceding five years, the valuation of the entire property would have been $6,326,003 less than what they put it at. It seems that in making the tentative assessment they adopted the stock and bond plan, but considered only the average market value of the stock and bonds for the preceding year. This gave a valuation of $138,178,660, or $8,611,997 in excess of what they finally decided upon. But, after hearing complainant, they decided upon the capitalization plan on the four-year basis. And, as stated, had they pursued either plan on the five-year basis, it would have given a valuation less than that which they made. There is hardly room, then, for defendants to contend that the fair cash value of complainant's entire property was

131 F.—20

in excess of the sum at which they fixed it when acting as a board. And the only grounds upon which they now contend that it was more are not tenable upon any reasonable view of the matter. Those grounds are that the fair cash value of said property will be shown to be considerably in excess of the sum at which it was put if the stock and bond plan is adopted, and the highest market value of the stock within a year previous or its value on the date of assessment is alone considered, or if the capitalization plan is followed, and the net earnings for the previous year are alone regarded. But, as indicated above, it is, as a rule, not reasonable to limit the consideration of either plan to so short a period, and there is nothing in this case to show that it should be treated as an exception to the rule.

Then, as to the proportion of the fair cash value of the entire property, which defendants took as the fair cash value of that part thereof in this state. They took 26 per cent. thereof. The facts in regard to this matter are these: Complainant operated in Kentucky 1,192.34 miles of road. It owned the Cecelia Branches, leased to the Illinois Central, and 46 miles long; the Clarksville & Princeton Division, leased to the Illinois Central, and 20.7 miles long; and a part of the Paducah & Memphis Line, leased to the Nashville, Chattanooga & St. Louis Railway, and 49.23 miles long; and controlled in a certain sense, if not in that of the statute, a part of the Nashville, Chattanooga & St. Louis Railway, 8.06 miles long. Adding these four sums to the mileage operated, makes a total of 1,316.33 miles of railroad operated, owned, leased, or controlled by complainant in this state. Out of this state complainant operated 2,238.86 miles of road. It owned the rest of the Paducah & Memphis Line, leased as above stated, 204.97 miles long. It held under a lease the Georgia Railroad, a one-half interest in which it had sublet to the Atlantic Coast Line, 624 miles long; and it controlled as aforesaid the rest of the Nashville, Chattanooga & St. Louis Railway, 933.60 miles long. Adding these three sums to the mileage operated, makes a total of 4,001.43 miles of railroad operated, owned, leased, or controlled outside of the state. Adding the mileage in and out of the state together makes a total mileage of 5,317.76. The per cent. that the mileage in Kentucky is of this sum is 24.75, or 1.25 per cent. less than the defendants took. They contend, however, that the mileage of the Georgia Railway and that of the Nashville, Chattanooga & St. Louis Railway Company should not be treated as part of complainant's mileage under the statute. If both are deducted, the percentage is 34.86; if the mileage alone of the latter is deducted, the percentage is 29.89; if the mileage alone of the former is deducted, the percentage is 27.87. So that it must be maintained that both mileages should be included in order to warrant a percentage as low as 26, though the whole of both mileages is not essential to bring it that low.

As to the Nashville, Chattanooga & St. Louis Railway Company, it is not contended that it was operated, owned, or leased by it. The right to include it is based solely upon the claim that it was controlled by complainant. The facts in regard to its control are that it owns over three-fifths of its capital stock, and thereby elects

its directors, and through them dictates and controls its policy. By virtue of said ownership it is entitled to share in the net earnings of said railroad, and said stock is pledged as security for part of its bonded indebtedness. The defendants contend that this railroad is not controlled by complainant within the meaning of the statute. They cite a number of authorities which they claim support this contention. They are principally to the effect that where one corporation owns the majority or the entire capital stock of another corporation, there is no merger of the latter into the former; that each is a separate entity; and that the former is not responsible for the contracts or torts of the latter. This is undoubtedly true, but we cannot see that this throws any light upon the sense in which the word "controls" is used in the statute in question. The only case cited which there is room to claim bears upon the proper construction of that word as so used is the case of Pullman Palace Car Co. v. Missouri Pac. Ry. Co., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499. In that case the construction of a contract between the Missouri Pacific Railway Company and the Pullman Palace Car Company was involved. The former corporation had agreed to use the latter's cars on "its own line of road and all roads which it now controls or may hereafter control by ownership, lease, or otherwise." The question was whether the Missouri Pacific Railway Company, a new corporation of the same name as that which made the contract with the Pullman Palace Car Company, formed by a consolidation of it with other corporations, was bound by that contract to use said car company's cars upon the railroad of the St. Louis, Iron Mountain & Southern Company, all but a small part of the stock of which it had acquired. It was held that it was not bound to do so, and that on two grounds. One was that the new railway company was only bound to carry out the contract as to roads controlled by the old one, and not as to roads controlled by it. The other was that the ownership or acquisition of the majority of the stock of another railroad with all its incidents was not a control within the meaning of that word as used in the contract. But that case is not an authority for the position that within the meaning of the statute the word "control," as there used, does not include such a relation to a railroad. In that contract the word "operate" was not used at all, and particularly was it not used in juxtaposition with the word "control," as in the statute. There was, therefore, nothing in the contract to prevent it being given the sense of "operate." On the other hand, it is evident that it was used therein in that sense. The roads upon which the railway company was to use said cars were those it controlled "by ownership, lease, or otherwise"; i. e., roads which it operated by virtue of ownership, lease, or some other contract. Besides, there was no reason why the word "control" should have been held to embrace a relationship to another railroad of the kind in question. How different here. The four words, "operated," "owned," "leased," and "controlled" are used in juxtaposition, and referred to in the alternative. Each, therefore, should be given some meaning not embraced in the other. "Controlled," therefore, cannot mean "operated." And the only distinct

meaning which can be given to it is such as to embrace a relationship of the kind in question. And it was reasonable for the Legislature to have intended that, where such a relationship existed, the mileage of such corporation so controlled should be included in determining fair cash value of the entire property. The ownership of the majority of the stock of another railroad corporation with the indirect control arising therefrom adds to the fair cash value of the entire property, a portion of which is to be allotted to this state for assessment. The stock and bonds of the controlling corporation are increased in value thereby. If dividends are received on the stock, they represent a portion of the net earnings of the controlled corporation, and go to swell the net earnings from which, on the capitalization plan, the fair cash value of the whole property is ascertained. Nor are such dividends the only contribution which the controlled corporation makes to the net earnings of the controlling corporation. It is a feeder to other railroads, both in and out of the state, operated, owned, or leased by it, and in this way helps out those net earnings. It may be thought, though, that it is unreasonable to include the entire mileage, and that only such proportion thereof should be included as the stock owned by the controlling corporation bears to the whole stock. This, however, is not a consideration for excluding such relationship from the statute, but for the board in determining the percentage of the entire valuation that should be allotted to this state. But it cannot be said that, in the absence of an investigation as to the values of the different portions of a railroad system, and the contributions which they make to the value of the whole, it would be unreasonable for the board to include the entire mileage. For it is possible that a proportionate part of one portion of such system may be equal in value to the entire part of another portion on the mileage basis, and contribute as much or more to the value of the whole. Our conclusion, therefore, is that a relationship of the kind in question is within the meaning of the statute. This view of the matter receives support from the following extract from the opinion of Judge Thayer in the case of United States v. Northern Securities Co. (C. C.) 120 Fed. 721, to wit:

"It will not do to say that, so long as each railroad company has its own board of directors, they operate independently, and are not controlled by the owner of the majority of their stock. It is the common experience of mankind that the acts of corporations are dictated and their policy is controlled by those who own the majority of their stock. Indeed, one of the favorite methods in these days, and about the only method, of obtaining control of a corporation, is to purchase the greater part of its stock. It was the method pursued by the Northern Pacific and Great Northern Companies to obtain control of the Chicago, Burlington & Quincy Railroad. And, so long as directors are chosen by stockholders, the latter will necessarily dominate the former, and in a real sense determine all important corporate acts. The fact that the ownership of a majority of the capital stock of a corporation gives one the mastery and control of the corporation was distinctly recognized and declared in Pearsall v. Great Northern Railway, 161 U. S. 646, 671, 16 Sup. Ct. 705, 710, 40 L. Ed. 838. The same fact has been recognized and declared by other courts. Pennsylvania R. Co. v. Commonwealth (Pa.) 7 Atl. 368, 371; Farmers' Loan & Trust Co. v. New York & N. Ry. Co., 150 N. Y. 410, 425, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689; People ex rel. v. Chicago Gas Trust Co., 130 Ill. 268, 22 N. E. 798, 802, 8 L. R. A. 497, 17 Am. St. Rep. 319. In opposition to this view counsel cite Pullman Car Co. v. Missouri Pacific Co., 115 U. S. 587, 596, 6 Sup.

Ct. 194, 29 L. Ed. 499, but in that case the meaning of the word 'controlled,' as used in private contract, was the point under consideration, and what was said on the subject cannot be held applicable to cases arising under the anti-trust act, when the point involved is whether the ownership of all the stock of two competing and parallel railroads vest the owner thereof with the power to suppress competition between such roads. We entertain no doubt that it does. Indeed, we regard the suppression of competition, and to that extent a restraint of commerce, as the natural and inevitable result of such ownership."

Then, as to the Georgia Railroad. That comes within the strict terms of the statute. It was leased to the complainant. The only possible question could be as to whether the whole or only one-half of the mileage should be included. If the entire mileage of the Nashville, Chattanooga & St. Louis Railway and one-half that of the Georgia Railroad are included, then the percentage that the Kentucky mileage is to the whole mileage is 26.13, or just $^{13}/_{100}$ more than the board put it at. If only that proportion of the former mileage which complainant's stock bore to the total stock and one-half of the latter is included, the percentage is 28.03.

In view of all considerations, the determination of the fair cash value of that portion of complainant's property being at best a matter of great difficulty, we feel constrained to hold that such fair cash value did not exceed the per cent. of the fair cash value of the whole property at which the defendants fixed it when acting as a board. According to their testimony herein, they fixed it as the fair cash value thereof. The auditor testifies that they fixed the franchise at what they conceived to be its full value, and the treasurer that the value they fixed they adopted as the true value of the property. The Secretary of State testified that they arrived at it as 100 per cent. of the value, but that they used the most liberal means of reaching 100 per cent., and that it was fixed lower than, in his judgment, it ought to have been.

The result, then, of our consideration of the two matters of fact that are in question herein is that the property in this state subject to equalization after equalization had was assessed for the year 1902 at not exceeding 80 per cent. of its fair cash value by those who had to do with its assessment—first the local assessing officials, and then the State Board of Equalization; and that complainant's intangible property in this state has been assessed for that year at its fair cash value— at least at what must be accepted as its fair cash value—by the Board of Valuation and Assessment. There is here, then, a distinction between complainant and the owners of the former property of at least 20 per cent. Is or not this a denial to complainant of the equal protection of the laws within the meaning of those words in the fourteenth amendment to the federal Constitution, and hence an unlawful discrimination against it, which entitles it to the relief which it seeks? There is a difference or distinction between the owners of property subject to taxation in the valuation at which it is assessed that is not a violation of the fourteenth amendment, and therefore an illegal discrimination; and, on the other hand, there is such a difference or distinction that is. The question here is, on which side of the line does the difference or distinction involved herein belong? The rule on the subject has been laid down by the Sixth Circuit Court of Appeals in the cases of Taylor v. Louisville & N. R. Co., 88 Fed. 350, 31 C. C. A. 537; Louisville

Trust Co. v. Stone, 107 Fed. 305, 46 C. C. A. 299.   In the former case
Judge Taft said:

"Equity will not relieve against an assessment merely because it happens to
be at a higher rate than that of other property; that such inequalities, due to
mistake, to the fallibility of human judgment, or to other accidental causes,
must be borne, for the reason that absolute uniformity cannot be obtained;
*  *  *  in other words, what may be called 'sporadic cases of discrimination'
cannot be remedied by the chancellor.   He can only interfere when it is made
clear that there is, with respect to certain species of property, systematic, in-
tentional, and unlawful undervaluations for taxation by the taxing officers,
which necessarily affect an unjust discrimination against the species of prop-
erty of which the complainant is an owner.   The reason for this distinction is
obvious.   The occasional and accidental discriminations are inevitable in every
assessment, and are not likely to continue, because not the result of an illegal
purpose on the part of any one.   If equitable interference in such cases could
be invoked, the obstruction to the collection of taxes would be so frequent as
to be intolerable.   More than this, an action to enjoin a tax is a collateral at-
tack upon the judgment of a quasi judicial tribunal, and it cannot be justified
except on the ground of an obvious violation of law, or something equivalent
to fraud.   It does not where the injury complained of arises only from the
erroneous, but honest, judgment of the lawfully constituted tax tribunal.   The
interference by the chancellor in the case at bar and in the Cummings Case
rests on something equivalent to fraud in the tribunal imposing the tax.   The
various boards whose united action is by law intended to effect a uniform as-
sessment on all classes of property are to be regarded as one tribunal, and the
whole assessment on all classes of property is to be regarded as one judg-
ment.   If any board which is an essential part of the taxing system intention-
ally, and therefore fraudulently, violates the law by uniformly' undervaluing
certain classes of property, the assessment by other boards of the other classes
of property at the full value, though a literal compliance with the law, makes
the whole assessment, considered as one judgment, a fraud upon the fully as-
sessed property.   And this is true although the particular board assessing the
complainant's property may have been wholly free from fault or intentional
discrimination."

In the other case Judge Day said:

"It may be conceded that, if the allegations of the bill are made out, there
exists in respect to the property of complainant and others similarly situated,
a systematic, intentional, and illegal undervaluation of other property by the
taxing officers of the state, which necessarily effects an injurious discrimination
against the property of which the plaintiff is the owner, and a bill in equity
will be to restrain such illegal discrimination, and in such cases federal juris-
diction will arise because of the equal protection of the laws guarantied by
the fourteenth amendment." .

These two decisions are binding upon us as to what is the true rule
applicable to such cases.   Counsel for defendants cite a number of
authorities, principally from the Supreme Court of the United States,
in which the rule is laid down in different phraseology.   It is unneces-
sary for us to consider these cases, and see whether they lay down any
different rule, for those cases were considered in the two specially
referred to, and it was therein determined that the rule as herein laid
down was authorized and required by those cases.   From these state-
ments of the rule we gather that, in order that one whose property has
been fully valued may complain of an undervaluation of other prop-
erty, and entitled to have the valuation of his property cut down to
such undervaluation, two things are essential.   One is that the un-
dervaluation should have been intentional.   By this is meant that the
valuation at less than the full value should have been intended.   This,

and nothing more. The other is that the undervaluation should have been systematic or habitual; i. e., relate to a large species of property. An undervaluation that is intentional, but that is not systematic or habitual, cannot be complained of by such person. Possibly he could not complain of one that was systematic or habitual if it was not intentional. But it is hardly probable that an undervaluation could be systematic or habitual, and not be intentional. Probably, then, the essential features of an illegal discrimination of the character under consideration is that there should have been a systematic or habitual undervaluation. An undervaluation that is not so cannot be complained of though intentional, and an undervaluation that is so cannot but be intentional. Just how large the class to which the undervaluation relates must be it is not necessary to determine, for there can be no question but that the class undervalued here was large enough. Counsel for defendants seem to urge that it is essential that there should have been an agreement or combination between the different officers making the undervaluation to undervalue in order that the discrimination may be illegal. It is sufficient that, as a matter of fact, they systematically and habitually undervalue that portion of the property with which they have to do, even though there be no understanding or agreement between them so to do. Counsel for defendants seem further to urge that it is essential that the complainant have company; or, in other words, that it is not sufficient that a single taxpayer be fully valued, but the others belonging to the same class must have been fully valued also. We do not think so. The fact that all of his own class have been undervalued also but makes his case the stronger.

The quotations cited from certain authorities which lend color to these two positions should be construed in the light of the facts of the particular cases in which the language quoted was used.

Does this case, then, present an illegal discrimination within the requirements of the rule as thus laid down? We think it does. The property subject to equalization, being 77 per cent. of the taxable property in this state, was systematically, habitually, and intentionally undervalued to at least the extent of 20 per cent. for the year 1902, first by the local assessing officials and then by the equalizers. Not only this, but the Legislature of the state, by its latest expression on the subject, provided that it should be undervalued as much as 30 per cent. by the equalizers. So far as complainant having company in being fully valued is concerned, that is immaterial, as we have stated. But, though the evidence does not disclose how, relative to value, the intangible property of other corporations subject to the jurisdiction of the Board of Valuation and Assessment was assessed for the same year, it is reasonable to infer that they have been assessed on the same basis as complainant; i. e., at what the board considered to be the full value of said property. It is so alleged in the bill, and there is no evidence to the contrary.

It remains to consider several reasons urged by counsel for defendants why, notwithstanding the conclusions already reached, the complainant should be denied the relief it seeks.

1. It is claimed that the bill does not allege facts sufficient to bring the discrimination complained of within the rule as to what is essen-

tial to constitute illegal discrimination in such cases; or, in other words, that it is not alleged that the undervaluation of the property subject to equalization was systematically, habitually, and intentionally made. It is true that these words are not used, and the bill might have been fuller in this particular. It does, however, use language that is equivalent thereto. It alleges that the assessors of the various counties in the state uniformly assessed said property below its value, in many instances below 50 per cent., in over 90 per cent. below 80 per cent., and in very few counties above its value; and that the equalizers undertook to equalize all assessments coming before them on the basis of 80 per cent., but in reality did not equalize them at above 80 per cent. of their value. According to these allegations, the assessments of said property after equalization could not but have been systematically, habitually, and intentionally undervalued.

2. It is claimed that the bill should be dismissed because before bringing suit complainant did not pay or tender the amount which would be coming to the various counties, cities, towns, and taxing districts on account of that portion of the assessment of the intangible property not complained of herein. It did pay the amount of the tax due thereon to the state, but did not pay or tender to said local divisions the amounts which would be coming to them, respectively, on account of said portion of the assessment. Complainant advances two reasons why it was not bound to make such tender. One is that there has been no apportionment of said assessment, or any part thereof, by the Board of Valuation and Assessment, whose duty it was to make the apportionment. Hence the taxes on account of said portion of said assessment cannot be said to be due, and the amount thereof is not ascertainable until said apportionment. The other is that the question as to whether such an assessment is subject to apportionment had been put in suit, and had not then been decided by the court. We presume that reference is had to the case of Southern Ry. in Kentucky v. Coulter (Ky.) 68 S. W. 873. This case, however, was decided by the Court of Appeals June 10, 1902, which was before the bringing of this suit. But we think that for the first reason the point urged by defendants in this particular is not well taken.

3. It is urged that the ordinary taxpayers of the state have paid 50 cents on the $100 under the act of March 29, 1902, and complainant only 47½ cents, and that, therefore, complainant should not be entitled to the relief it seeks. This makes a difference only of $250 on the million, and is insignificant as compared with the difference complained of herein. But, to say the least, it is questionable whether the ordinary taxpayers were bound to pay more than 47½ cents, and it will take a lawsuit to settle the question. We do not think that complainant should be denied relief sought on this ground.

This disposes of every question made in this case. We are aware that perfect uniformity and perfect equality of taxation is a baseless dream; that the fourteenth amendment was not intended to compel the states to adopt an iron or cast-iron rule of equal taxation, and that, as said by Mr. Justice Harlan in the case of King v. Mullins, 171 U. S. 436, 18 Sup. Ct. 925, 43 L. Ed. 214: "The judiciaries should be very reluctant to interfere with the taxing system of a state, and should

never do so unless that which the state attempts to do is a palpable violation of the constitutional rights of the owners of property." The way we view it, to permit the valuation of complainant's intangible property as made to stand would be a palpable violation of its rights. It is an attempt to make it pay on a 100 per cent. valuation when the bulk of the taxpayers pay on not exceeding an 80 per cent. valuation. This of itself is sufficient to require that this court should intervene. Particularly is this so when it is considered that there is a possibility, at least, that the valuation of its intangible property may include the skill and efficiency with which its affairs are managed, and the personalty of individuals not subject to equalization largely escapes taxation at all.

We conclude, therefore, that complainant is entitled to the relief it seeks.